MENDEZ I. COHEN *vs.* JAMES V. WAGNER.—*December*, 1847.

If a party interested in real property, decreed to be sold by a trustee of the Court of Chancery, should apply to such trustee to know at what sum he intended limiting the sale, and was informed,—and if a few minutes before the sale, the trustee were to inform such party that his limit was several thousand dollars less, and in consequence thereof, the interest of such party had been prejudiced, the court would not ratify a sale at such lesser sum.

Where property was offered for sale under a decree on a *Saturday*, the *Sabbath* of a party interested, and who was prevented thereby from making arrangements to purchase the same, and he knew of the day fixed for sale several weeks before it took place, it was his duty to have applied to the trustee to change the day.  Omitting to do this, his failure must be regarded as a waiver of all objection to the day of sale as being his *Sabbath*, and he must abide the consequences of his own omission.

The practice of opening the biddings upon a Chancery sale upon a mere offering of an advance upon the purchaser's bid, has not been adopted in this State.

Mere inadequacy of price in a Chancery sale correctly conducted, is not, of itself, sufficient ground for vacating the sale.

A fair sale of property for $13,000, alleged to be well worth $15,000 or $20,000, will be ratified.  There was proof, however, in this case that extensive repairs were necessary to place the houses in good condition.

A sale made in conformity to the decree will not be set aside, or its ratification

refused for mere inadequacy of price, unless the court believe that such inadequacy was the result of fraud, surprise, mistake, or unfairness in the sale.

Inadequacy of price is, for the most part, regarded as the inducement to the action of the court, after the establishment of a cause deemed sufficient to warrant its nullifying interposition.

Where a stranger called on the trustee of a court about to offer property at public sale, and inquired what was his limit of sale, and was informed from $12,000 to $15,000, and the stranger said he would give $13,000, or find a purchaser at that sum; and the auctioneer, the agent of the trustee, casually heard in a conversation between by-standers, that either *W.* or the trustee, remarked that *W.* would give $13,000 for the property. The auctioneer then said to his clerk, who was in fact conducting the biddings, "*you have a bid of* $13,000"—the purchaser's name not being announced—and the clerk, after crying the property for some time, receiving no advance upon the bid from the company assembled, struck off the property to *W.* who agreed thereto. *Held,* that whether the bid was made by *W.* or by some other person acting for him, was immaterial. It is not necessary or usual to announce the name of the bidder, nor is it necessary to be known.

A communication of the trustee's limit as to price, made by him to the auctioneer employed to make a sale, and if he got no bid above that, to strike it off to *W.* is no objection to a sale. It does not prevent any person from bidding a larger amount, and such a course does not make it a private sale—but in form and substance, it is a public sale.

Inadequacy of price may be so gross and inordinate as to furnish evidence of fraud or misconduct in a trustee, such as would vitiate his sale.

APPEAL from the Court of Chancery.

This cause was before this court at this term (*ante* 97) in another form; the statements there reported constitute a part of this, and with the additional statements contained in the opinion of the judge of this court, show the grounds upon which the appellant excepted to the final ratification of the sale to the appellee.

In support and denial of the exceptions to the ratification of the reported sale, the following depositions were taken—much of the proof not being considered material by the reporter, is however omitted.

*Jabez M. Gill,* on the part of the exceptant, deposes: that he knows the property called the *Holliday Street Theatre*—has known it for some years; several years ago he was in it, frequently did repairs for four years; deponent is a carpenter, a master builder, a competent judge of property in *Baltimore.*

The ground on which the *Theatre* is built, is worth $150 per foot, independently of the buildings erected on it; the structures on it are worth from $17,000 to $18,000, including the scenery and fixtures.

(Cross-examined.)   He does not know the present condition of the *Theatre*.

*Francis Meyer*, on the part of exceptant, says: that he knows the *Holliday Street Theatre*—believes that $20,000 is a fair price for it; it would bring the interest of that amount if the affairs were well administered; deponent was at the sale of the property at the *Exchange*, on June 20th, 1846; he heard $13,000 cried by the auctioneer; there was no advance on that—the auctioneer cried it a long time at that amount, and there was no further bid.

(Cross-examined.)   Deponent is a large stockholder in *Front Street Theatre*—he has not received one cent of interest on his investment since 1837.

*Joseph Green*, on the part of the exceptant, deposes: that he knows the *Holliday Street Theatre*—has known it since 1830; deponent has confidence in his judgment of the value of property in *Baltimore*; thinks the value of the *Holliday Street Theatre*, excepting scenery and decorations, is $15,000; the value of the scenery and decorations in connection with the *Theatre*, if the present manager conducts the *Theatre*, is $1,000; if he should not conduct it, the value would be about $50; knows nothing of the value of property on *Holliday Street;* it is the prettiest little *Theatre* in the *United States ;* it is the best *Theatre* for sound; it is one of the very best *Theatres* for its size in the *United States ;* it has a good location—the building is not in good order; deponent was treasurer of the *Theatre* from 1834 to 1837; during that time the *Theatre* was respectively under the management of the following persons, &c.   Theatrical property has been very much depressed every where for the last ten years.   Deponent was present at the sale of the *Holliday Street Theatre;* he did not see *Mr. Cohen* there—he might have been there; the auctioneer *cried the bid for some length of time* before he struck the

property off; when the deponent went to the sale he had no idea of bidding, but if he had seen two friends, whom he has since seen, he would have bid for the property.

*George W. Porter*, on the part of the exceptant, deposes: that he is the superintendent of the *Reading Room* at the *Exchange*—was present at the sale of the *Holliday Street Theatre*, on June 20th, 1846. It was deponent's place to be present at the sale, and ascertain whether a sale had been made—deponent derived his information as to sales from the auctioneer—deponent doubted from what had transpired at the sale, whether the sale was a *bona fide* one. The property was set up in a formal manner, as is usual on real sales. *Cannon, Bennett & Co.* acted as auctioneers—*Mr. Bennett* was crier. *Mr. Cannon* made a bid of $13,000, which was the only bid made—the bid was dwelt on for several minutes; in consequence of the manner of the sale, deponent doubted whether it was a real sale; it is not usual for auctioneers to make the first bid. When the property was knocked down, supposing that it was not a real sale, deponent applied to *Mr. Cannon* for information on the subject. *Mr. Cannon* stated that he was not certain, but that deponent should make the charge for the use of the room, and if it turned out otherwise, the matter would be corrected. *Mr. Cannon* further stated, that he was instructed to bid $13,000—to dwell upon it, and if no advance was made, to knock it down to *Mr. James V. Wagner.*

(Cross-examined.) Mr. Cohen was present at the sale. If any person had chosen to bid above $13,000, they had ample time to do so. The moment the property was struck off, *Mr. Wagner's* name was announced as the purchaser.

*George Brown*, produced on the part of the exceptant, deposes and says: that he knows the *Holliday Street Theatre;* he has known that property since 1805; his dwelling is in the same street, nearly opposite. The value of the property is difficult to ascertain, the location not being desirable to some persons. Deponent was present at the sale of the *Theatre*—he went from curiosity—supposed that the property might bring $15,000.

(Cross-examined.)   When the property was knocked off, deponent took it for granted that it was a sale—he did not know who made the bid.   Deponent was asked by a friend why he did not purchase the property, as the price was a low one; deponent answered, that if he had known it was going at $13,000, he might have bought it.

*Robert Carey Long,* on the part of the exceptant, deposes: that his profession is that of an architect.   He knows the *Holliday Street Theatre*—has been in it and examined it professionally.   From the size of the lot, and the character of the buildings, deponent's impression was, that the property was worth at least $20,000.   That impression was founded on the size of the lot and the condition of the buildings.   When deponent saw the property advertised, his expectation was that it would bring at least $20,000.

*William C. Conine,* produced on the part of the exceptant, affirmed: that he was present at the sale of the *Holliday Street Theatre,* in June, 1846, from the time the bidding commenced until the property was knocked down.   Deponent heard *Mr. Cannon* say that he was authorized to make a bid of $13,000. Deponent does not mean to say, that he is certain that he heard *Mr. Cannon* say he was authorized to bid $13,000, but that *Mr. Cannon* bid $13,000, and deponent inferred that he, *Mr. Cannon,* was authorized to make the bid.   It is a common case for auctioneers to start property by making a bid.   His idea was that the bid was for the purpose of settling up the matter among the proprietors.   Deponent thinks he saw *Mr. Wagner* at the sale—did not see him bid or authorize a bid. The property was cried for a short time, deponent does not know how long, but for a few minutes.   Before *Mr. Wagner* left the room, it was understood that *Mr. Wagner* was the purchaser.   The property was not cried the usual length of time, for property of the value of the *Holliday Street Theatre* ; there was no competition—the property was knocked down very soon.   Deponent does not know the value of such property— he cannot say that it was cheap—thought at the time it was cheap.

*John B. Cannon*, produced on the part of *James V. Wagner*, deposes and says: that *Cannon, Bennett & Co.* were the auctioneers of the sale of the *Holliday Street Theatre*, at the sale of June 20th, at the *Exchange.* Deponent was not employed by *Mr. Wagner* in any manner or shape to purchase the *Theatre.* Previously to the sale, deponent was walking about listening to the conversation between the by-standers, in the course of which either *Mr. Wagner* or the trustee, remarked that *Mr. Wagner* would give $13,000 for the property. *Mr. Bennett* announced the sale as a free and peremptory sale; read the advertisement, and asked for a bid several times: no one bid at first. Deponent, who was standing out, remarked "you have a bid of $13,000;" after that, *Mr. Bennett* cried the property as long as usual; deponent went to the stand; *Mr. Bennett* asked whose bid it was? Deponent privately stated to *Mr. Bennett* that it was *Mr. Wagner's* bid. *Mr. Bennett* dwelt upon the bid a long time, as long as if he had been selling *Barnum's Hotel.* Deponent has sold a very large amount of real estate in the City of *Baltimore.* *Mr. Bennett* dwelt longer on the bid than deponent would have done by some time. Deponent being asked by the solicitor for the exceptant, how long the property was cried, answers that he cannot specify the length of time;—being asked if it was ten minutes, answers that he cannot say;—being asked if it was five minutes, answers that he cannot say.

(Cross-examined.) Deponent was not authorized by any one to make a bid; he merely heard that *Mr. Wagner* would give $13,000, and made the offer himself. When he mentioned to *Mr. Bennett* that he had a bid of $13,000, he, deponent, did not say he was authorized to offer that sum. Prior to the sale, when deponent asked *Mr. Latrobe* what price was expected, he said he did not know—the highest price that could be got for it; that the property was to be sold.

*Deter Barger*, produced on the part of *James V. Wagner*, deposes: that he has been engaged in building and affairs connected with property in the City of *Baltimore* for thirty years; has considerable knowledge of the value of property

in the City of *Baltimore*, and knows the *Holliday Street Theatre* and lot. If deponent could see his way clear, he would give $12,000 for the *Holliday Street Theatre* and lot.

(Cross-examined.) In estimating the *Holliday Street Theatre* property, and expressing his willingness to give $12,000 for it, he predicates his opinion on the basis that real estate ought to yield ten per cent. on the amount of the investments.

The witness being asked by the solicitor for the exceptant what property would be worth, provided it would bring regularly an annual rent of $1,000, and besides that, a revenue of $1,260 for free tickets to be sold by the proprietors, and $340 as rent for the bars—received by the proprietors in addition to the above sums, and also the reserved right of an entire stage-box—what then would deponent consider the value of the property? To which he answered, that if he had a guarantee of such a revenue, his estimate of the value of the property would be accordingly. The value of the property where the *Theatre* stands—there being no alley in the rear—is not more than from $4 50 to $5 per front foot on lease. The walls of the *Theatre* building are substantial; the roof leaks, and is defective; the staging is also defective.

*Joseph Robinson*, produced on the part of the exceptant, deposes: that he knows the *Holliday Street Theatre*—has known it ever since it was built. In 1839 or 1840, it was offered for sale by *Mr. Latrobe* at the *Exchange*. Deponent was authorized by a chartered company to bid $25,000 for it; he did not bid, but authorized *Mr. Joshua Dorsey*, by written authority, to bid that amount. *Mr. Dorsey* bid $25,000, and a few hundred over by deponent's authority. The property was then bid in at a price beyond *Mr. Dorsey's* bid, and *Mr. Latrobe* informed defendant that it was bid in; that it did not go to the limits. Deponent thought that the *Holliday Street Theatre* would bring $15,000 at the sale; has sold a large mass of proprietor's tickets; the price depended on the season and the management. When *Mr. Maywood* was manager of the *Holliday Street Theatre*, he bought up eighty or ninety of the season tickets at $12 per annum; at that time the price

of box tickets was $1—of pit tickets, fifty cents each; at present the price of box tickets is fifty cents—of pit tickets, twenty-five cents each; last fall deponent sold one season ticket for *Randall H. Moale, Esq.* for $8; he might have sold more, but does not recollect them; that season was from early in September to the 1st of January. Deponent always sold *Mr. Benjamin I. Cohen's* tickets for from $3 50 to $10 per annum.

(Cross-examined.) Theatricals for the last fifteen years have been at a very low ebb in *Baltimore*—the managers generally failed. No rent was received from *Burton*, and but little from *Ward*. Even when the trustees received no rent, the proprietors nevertheless used their season tickets.

*James Gifford*, produced on the part of *James V. Wagner*, deposes: that he is well acquainted with the *Holliday Street Theatre;* he took charge of the house in the year 1840. The house is in a very bad condition, &c.; he thinks it will require from $6,000 to $7,000 to put the *Theatre*, within the four walls, in complete order. In making his estimate, when deponent speaks of the expense necessary to put the *Theatre* in order, he merely means what would be necessary to take out the part which is decayed and renew it. Deponent being asked by the solicitor for the exceptant for a specification of the items of his estimate, says that he has no estimate of the items. Deponent shored up the stage last winter, and believed at the time that if the stage had not been shored, it would have fallen; the side which was shored about four or five years ago is now settling; the stage cannot be used to work the machinery without shoring; the machinery cannot be properly worked by shoring the stage.

(Cross-examined.) The *Theatre* is now in use; the stage is used—the machinery is used; as a make-shift, the scenery is used; the houses are tolerably fair; the last night was a fair night; the night previous the house was very well filled; the three nights preceding the injunction were all fair houses. Deponent has done all the carpenter's work of the *Theatre;*

cannot tell the amount of his bill for any of the three years past.

*Jacob I. Cohen, Jr.* produced on the part of the exceptant, deposes: That he was present at the sale of the *Holliday Street Theatre*, on June 20th, 1844. Deponent answered that he did not suppose the property would be sold at that time, from what he had heard before the day of sale, and his observations after he entered the *Exchange* before the sale. By his expressions of what he had heard before the day of sale, he refers to a conversation which he had with *Mr. Latrobe*, the trustee.

Some days before the sale, deponent called on *Mr. Latrobe*, to obtain information in relation to a claim which deponent had as a stockholder. Among other matters, deponent inquired of *Mr. Latrobe* as to the probable price which the *Theatre* might bring, and whether he would limit the price; deponent and *Mr. Latrobe* spoke of the former occasion, when the *Theatre* had been knocked off for $20,000. It was a matter of doubt with both *Mr. Latrobe* and the deponent, whether the *Theatre* would bring $20,000 at this time. Deponent enquired of *Mr. Latrobe* if he intended to fix any limit under which the *Theatre* would not be sold? He, *Mr. Latrobe*, said no; that he had not fixed any price, but would be governed by that discretion which trustees generally exercise in relation to property in their hands; that he would make up his mind between that time and the time of sale, as to the price. He seemed to settle down, so far as deponent could judge, at $15,000 as the price which the *Theatre* should bring at the time. *Mr. Latrobe* remarked, that although it might not bring $15,000 at this time, at some future time it might bring a less amount; if so, he would consider himself justified in accepting a less sum than $15,000, after having exercised the discretion which he thought he might use in relation to the matter. Deponent parted from *Mr. Latrobe* under the conviction that he would not sell the property for less than $15,000 on the day of sale; that conviction was produced by *Mr. Latrobe's* remarks during this conversation. Deponent attended the sale, which took

place some twelve or fifteen days after the above conversation, under the conviction arising from this previous conversation with *Mr. Latrobe,* that the property would not be sold for a less sum than $15,000. From the small number of persons attending, the character of the persons attending, and the other circumstances, deponent supposed that there would be no sale. Deponent saw *Mr. Wagner* at the sale, did not suppose that he was interested in the sale, as he was not a stockholder. The crier read off the advertisement, and was then ready for a bid. *Mr. Cannon* then bid $13,000; the bid was cried the usual time and in the usual manner; there was no other bid given and the property was knocked off; the offering did not occupy a long time; about the time the bid was closed a few other persons came into the Rotunda; after the property was knocked down, deponent on retiring, enquired of *Mr. Cannon* if the property was sold, he said he did not know, that he had made the bid for *Mr. Wagner.* After the conversation which deponent had with *Mr. Latrobe,* deponent was firmly under the impression that the *Theatre* would not be sold at a price under $15,000. Deponent and his brother, *Mendez Cohen,* went together to the *Exchange* to the sale. In going down he remarked to his brother that he did not think there would be any sale—not that he supposed the *Theatre* would not bring over $15,000, but that he thought some arrangement would have been made to supersede the necessity of a sale.

When the property was cried at $13,000, deponent did not suppose it was a real bid, but thought it was one such as auctioneers generally make to start property; he would have gone from the *Exchange* under the impression that the property was not sold, if he had not made the enquiry of *Mr. Cannon,* and received the answer which he has above stated.

The sale was on Saturday, a day on which neither deponent or his brother transacted any business. If *Mr. Mendez Cohen* had been disposed to purchase the property, his ability to purchase it at $15,000, or over, is ample.

Deponent knows the *Holliday Street Theatre,* he has known it for a long time; his estimate of its value would depend on

circumstances; for instance, some persons might be disposed to purchase a *Theatre*, some might not. In the hands of a prudent person, capable of managing the property, it would be low at $15,000; deponent thinks that the trustee, under the circumstances of the case, would have been justified in selling at that price; deponent was formerly owner of a share in the stock of the *Theatre*; he was not in the habit of selling season tickets, but did so once or twice; he sold one some time last year for the season at $8; that season did not embrace a whole year, there are several seasons in the year.

On being interrogated by the solicitor for *Mr. Wagner*, deponent answered that he saw *Mr. Wagner*, *Mr. Conine*, *Mr. Glenn*, *Mr. Brune*, and *Mr. George Brown* at the sale; he supposes that either of those gentlemen was amply competent to purchase. *Mr. Brown* lives nearly opposite the *Theatre*, and is one of our wealthiest citizens.

(Cross-examined.) Deponent did not announce at the sale to any person that there was a limit put on the *Theatre*; he did not communicate to any of the above named persons that the property would not be sold under $15,000. On offering the property the auctioneer read the advertisement, which stated that the sale would be peremptory. The auctioneer did not say, so far as deponent heard, that he had a bid, and the sale would be positive. If deponent had heard any thing of that kind, he does not think that he would have asked *Mr. Cannon* if the property had been sold.

During the time that deponent and his brothers were engaged in banking, their bank was open on Saturday to receive deposits and pay checks. In any matter which concerns the public, and not himself, deponent feels it his duty to attend to business of that character.

Deponent does not know that his brother ever asked him to contribute towards the expenses of this proceeding. If his brother called on him, he would feel himself bound to contribute. Deponent does not know of any contributions of $2 towards defraying the expenses of these proceedings. His brother, *Mendez Cohen*, and himself reside together—but

they have never had any conversation as to the manner in which the expenses of the exceptions are to be borne.

A great part of the shares of stock now held by *Mr. Mendez Cohen*, were formerly the property of *J. I. Cohen, Jr. & Brothers*. *Mr. Mendez Cohen* paid for them at the rate of $150 per share. Deponent has now no interest in the *Theatre*, having disposed of the only share which he held, for the purpose of becoming a witness in this case—understanding that course was necessary for that purpose. He was not aware of any meeting of stockholders—nor was he aware that any meeting of the stockholders was held, at which it was resolved that the *Theatre* should be limited at $15,000; nor did he communicate such a fact to *Mr. Latrobe*. Deponent was not aware of any meeting of stockholders. Neither deponent, or his brother, instructed *Mr. Latrobe* to limit the price of the *Theatre* at $15,000.

*John H. B. Latrobe*, produced by *James V. Wagner*, deposes: That he had one or two conversations with *Mr. Mendez Cohen*, and one conversation with *Mr. J. I. Cohen, Jr.* prior to the day of sale, at the office of deponent. Both of these gentlemen enquired as to the limit of the price of the *Theatre*, and whether deponent had fixed one: and to both of these gentlemen, deponent said explicitly and emphatically that he had fixed no limit, but would make enquiries on the subject, and would fix a limit before the day of sale, &c. &c.

From the day of deponent's interview with *Mr. Cohen* to the day of sale, deponent has no recollection of having seen him; saw him on the day of sale, but had no conversation with him. Deponent has no recollection of *Mr. Cohen* objecting, during the interview, to the sale having been fixed on Saturday. Deponent fixed on the day without reference to *Mr. Cohen*, and would have fixed on any other day if it had occurred to him, and *Mr. Cohen* had requested it, as a matter of courtesy to a gentleman interested in the matter. On the day of sale, *Mr. Mendez Cohen* mentioned to deponent that it was the *Jewish Sabbath*, which was the first time that it occurred to him, as he now recollects.

On the day of the sale of June 20th, 1846, at the *Exchange*, deponent took a seat for a few moments at the side of *Mr. Mendez Cohen.* A very short time before the sale, he asked deponent what was the limit. Deponent replied $13,000. *Mr. Mendez Cohen* expressed his strong dissatisfaction. Deponent suggested to him that he should bid himself, as a mode of *protecting* his interests. He said that was his Sabbath, and he could not do so. Deponent then replied that there were persons present who would do it for him, which *Mr. Cohen* said he could not do it—deponent understanding *Mr. Cohen* to decline doing by another what he could not personally do.

The auctioneer soon after commenced crying the property. Deponent's impression is that the auctioneer said that the property was fairly in the market; but does not recollect his saying that there was a real bid.

Deponent being asked by the solicitor for exceptants, what interviews he had with *Mr. Mendez Cohen,* referred to in his answer, says that he had a conversation with *Mr. M. Cohen* in the court-room—he being then on the jury—and is under the impression that he had another at his, deponent's office, although about this is not certain.

The purport of these conversations was to ascertain if deponent had fixed a limit for the price; in which he stated that he had fixed no limit, but would make enquiries, and do so before the day of sale. In the course of that conversation, deponent may have said that he would see some of the stockholders on the subject, but he has no recollection of having said so.

The only conversation deponent had with *Mr. Glenn* was on the day of sale at deponent's office, a few hours before the sale, and at the place of sale, as mentioned in deponent's answer to the exceptions in this cause.

When *Mr. Glenn* called on deponent at his office, he asked him what was his limit of sale; deponent's answer was, as made in his answer to the exceptions, from $12,000 to $15,000. *Mr. Glenn* then said that he would give $13,000 for the property. Deponent is not certain whether *Mr. Glenn* said that

he would give or find a purchaser at $13,000. This conversation was a brief one. And the next time deponent saw *Mr. Glenn* was at the place of sale. Deponent did not regard the price bid by *Mr. Benjamin I. Cohen*, at the sale in 1842, as fixing any value on the property. He thought it an arrangement among the parties interested.

*Francis Bennett*, produced on the part of *James V. Wagner*, deposes: that he is one of the firm of *Cannon, Bennett & Co.* Deponent is the auctioneer who sold the *Holliday Street Theatre*. At the sale of June 20th, 1846, there was a respectable company present. The property was set up, and announced to be a peremptory sale—read so from the advertisement, which was headed peremptory sale; deponent also named several different times before he knocked the property off, that it would be a peremptory sale; that he had an actual bid, and the property would be sold, without reserve, if there was not another dollar bid upon it.

Deponent dwelt on the bid longer than usual—much longer than he has frequently done in selling large pieces of property;—he was informed that the bid was *Mr. Wagner's* before he first cried it.

(Cross-examined.) *Mr. Cannon* informed him before he cried it that it was *Mr. Wagner's* bid. *Mr. Cannon* was standing in front of the stand—stated to deponent that *Mr. Wagner* bid $13,000; this was directly after deponent read the advertisement. *Mr. Cannon* said in a tone of voice, sufficiently loud for the auditory to hear him, that it was *Mr. Wagner's* bid. There being but one bid on the property, deponent cried it much longer than if there had been three or four bids. *Mr. Wagner* himself made no bid. *Mr. Latrobe* informed deponent that it was to be a peremptory sale. Deponent heard no bid, except *Mr. Cannon's*.

The estimate of necessary repairs on the *Theatre* was $4,331.

After these depositions had been taken, the appellant, by his petition, offered to take the property at $15,000,—and if the sale should be set aside, he offered to start the bidding at that

32 v.6

sum,—and if the property should be struck off to him at that price, to pay all expenses incident to a *second* sale,—and if a deposit is required, he is ready to make the same.

On the 9th November, 1846, the Chancellor (BLAND) overruled the exceptions and ratified the sale, with costs: from which order *Mendez I. Cohen* appealed to this court.

The cause was argued before ARCHER, C. J., DORSEY, SPENCE and MARTIN, J.

By W. SCHLEY and NELSON for the appellant, and

By REVERDY JOHNSON and McMAHON for the appellee.

DORSEY, J., delivered the opinion of this court.

Had the proof sustained that part of the exceptant's first exception, which alleges that the said *Mendez I. Cohen*, being a stockholder, and interested in the proceeds of said property, after the sale was advertised by the said trustee, and about two or three weeks before the sale, applied to the said *J. H. B. Latrobe* to know at what sum he intended limiting the price of the sale of the said *Theatre* and property, and was informed $20,000; that a few minutes before the sale, the said *Latrobe* informed the said *Cohen* that his limit was $12,500, and that in consequence thereof his interests in the sale had been prejudiced, such an objection to the ratification of the sale could not have been successfully resisted. But the allegations thus made, being wholly disproved by the testimony in the cause, the validity of the sale stands unaffected by it.

The second ground assigned in the first exception against the ratification of the sale is, "that the day of sale was Saturday, the Sabbath of the said *Cohen*, who was thereby prevented from making arrangements to purchase said property," as he could not make the purchase on his Sabbath day, or so endeavor as to prevent a sacrifice of said property. Conceding (for the mere purpose of considering it) the sufficiency of this objection, if made in the proper time and manner, let us enquire whether, under the circumstances in proof in this case,

it ought to avail the exceptant. It can derive no support from the allegation preceding it, that two or three weeks before the sale, the trustee informed the exceptant that the limit at which he would sell the property at the approaching sale was $20,000, because the fact of such information has, as above stated, been disproved. Was it made at the proper time?—is then the first inquiry. The exceptant knew the day fixed for the sale for weeks before it took place, and also, that the trustee would fix no limitation as to the price, until the day of sale. If then, the day of sale being his Sabbath, subjected him to the consequences he in his exception ascribes to it, he ought, with all convenient speed, after the day of sale became known to him, to have applied to the trustee to change the day, and apprised him of the grounds of his application. His failure to do this must be regarded as a waiver of all objection to the day of sale, as being a *Jewish* Sabbath; and he must abide the consequences of his own omission.

Under the first exception, a third ground is relied on for withholding the ratification of the sale for $13,000, of property alleged to be " well worth $15,000 or $20,000, or more."

From the views entertained of the effect which would result from the asserted inadequacy of the price, if it, in truth, existed, it is deemed unnecessary to enquire whether the assertion be sustained by proof? The practice of opening the biddings in chancery sales, upon the mere offering of an advance upon the purchaser's bid, has not been adopted in *Maryland*; and its non-adoption is founded on cogent reasons of justice and policy. The doctrine that mere inadequacy of price in a chancery sale, where the sale has been made conformably to the powers and directions specified in the decree, is not of itself sufficient ground for vacating the sale, has been so frequently announced by the judicial tribunals of this State, that a special reference to authorities to sustain it is deemed unnecessary. A sale thus made will not be set aside, or its ratification refused for inadequacy of price, unless the court believe that such inadequacy was the result of fraud, surprise, mistake, or unfairness in the sale. And the inadequacy of

price is for the most part regarded as the inducement to the action of the court, after the establishment of a cause deemed sufficient to warrant its nullifying interposition. The case of *Tyson vs. Mickle et al.* 2 *Gill*, 384, which has been referred to as an authority in the case before us, cannot have the slightest weight on the question now to be determined.

The cases are wholly dissimilar; differing as widely in their facts as in the principles of law, by which they must be decided. In the case before us, the trustee made the sale in strict conformity to the powers and directions given to him by the decree of the Chancery Court; and, therefore, the purchaser having entered into the contract with a duly authorized agent, at a *bona fide* sale, fairly conducted, had a right to insist upon its validity—although at the time it was made, it operated prejudicially to those whose interests it was designed to pass.

But, in the case of *Tyson vs. Mickle et al.*, the purchaser knew, or is presumed to have known, at the time of his purchase, that he entered into a contract with an unauthorized agent,—and that its affirmance, unless assented to by the parties concerned, depended upon the equitable circumstances, with which it appealed to the justice and conscience of the Chancellor; and that if any of the parties interested objected to the sale, and showed that the property was sold at less than its fair market value at the time of sale, or at less than it would have brought had the sale been made at public auction, according to the terms of the decree, that the sale would not be ratified. In the making of such an unauthorized sale, the trustee is the agent of the Chancery Court, and not of the parties to the suit,—and, therefore, it is not to be set aside as a matter of course, if objected to by one of the parties. But it is to be vacated by the Chancellor, if it appear to him that the objectant was damnified by the sale; that its vacation is required as an act of justice to him. It was the absence of all proof of such damnification or injustice to the objectant, that induced this court to ratify the sale made in the case of *Tyson vs. Mickle et al.*

That the inadequacy of price alleged as existing in the sale

before us would not, in the State of *New York*, be regarded as a sufficient ground for refusing to ratify or nullify such a sale, is abundantly shown by the cases of *Williamson vs. Dale and others*, 3 *Johns. Chan. R.* 290. *Woodhull vs. Osborne*, 2 *Edwards' Ch. R.* 614. *American Insurance Company vs. Oakley*, 9 *Paige*, 259; and *Tripp vs. Cook*, 26 *Wendell*, 143.

The second exception states that the exceptant was surprised and prejudiced in his rights by the sale. If it be true that he was surprised by the sale, it should, according to the proof in the cause, be attributed to his own want of foresight and caution. If he has been prejudiced in his rights, it is attributable to the same causes. He has nobody to complain of but himself. The trustee appears in all things faithfully to have discharged the duties of his trust.

The third exception is, that the sale was made by the said trustee through an auctioneer, who, by his crier, put up said property at $13,000; that said bid was by the auctioneer, and there was no bid in fact made at the sale above, or at that sum by any person. The proof in the cause clearly shows that there was a real bid of $13,000 made for *Wagner*, the purchaser, and that on that bid the property was struck off to him. Whether the bid was made by *Wagner*, or by some other person acting in his behalf, is wholly immaterial. Neither in practice, nor in principle, is it necessary or usual to announce at the time the bid is received the name of the bidder; nor is it at all necessary that it should be known to the bidders, or persons attending the sale, before the property is struck off. The third exception, therefore, cannot avail the exceptant.

The fourth exception is, that the said trustee, before the sale, told the auctioneer that the limit was $13,000, and if he got no bid above that, to strike it off to *Mr. Wagner*. How this communication from the trustee to the auctioneer can form an objection to the sale, it is difficult to divine. It is not pretended that it prevented any other person from bidding a larger amount; nor does it appear how it could have had any such tendency. Such a communication was the natural, legitimate result of the circumstances under which the sale was about to

take place.  It forms not the shadow of an objection to the validity of the sale.

The fifth exception is, that in substance it was not a public sale, though so in form.  There is nothing in the proof taken in the cause to sustain this exception.  Both in form and substance, it was a valid public sale,—and the Chancellor's final order for the ratification thereof should be affirmed by this court, with costs.

From what has been stated in this opinion, we are not to be understood as deciding, that the inadequacy of price may not be so gross and inordinate as to furnish evidence of such misconduct or fraud in the trustee as would vitiate his sale.

ORDER AFFIRMED.