Mr. Justice Hagner
delivered the opinion of the Court:
In these cases three questions have been argued before us involving the rights of George Taylor to certain real estate in this city, and affecting the distribution of the proceeds of a sale of that property made by the trustees under a deed of trust.
1st. .There is an appeal from a decree of the Equity Court dismissing a bill filed by Taylor to proeui’e the rescission of the sale made by the trustees under the deed of trust.
2d. In the consolidated causes in equity the Equity Court has certified, to be heard here in the first instance, the exceptions to the report of the Auditor distributing the proceeds of that sale.
3d. Certain questions in the case at law of Moses vs. Taylor, under the landlord and tenant law, were also certified to this court.
The bill in the case of Taylor vs. Tyler and Rutherford, *458 trustees, William B. Moses and the Girard Insurance Company, was filed December 15, 1888; Charles C. Duncanson was subsequently made a party defendant by amendment.
The bill as amended charges that on July 2, 1885, the complainant executed a deed to Tyler and Rutherford, as trustees, of lots numbered forty-nine to sixty, both inclusive, and of the south fifteen feet of lot forty-eight of George Taylor’s subdivision of part of square 214, as laid down in the subdivision recorded in the surveyor’s office of the District of Columbia; in trust to secure an indebtedness of $60,000, payable in three years, with semi-annual interest, to the Girard Insurance Company; that on the 26th of November, 1888, the trustees advertised the property pursuant to the provisions of the trusts, and on the evening of the 7th of December, 1888, offered it for sale when it was nearly dark; that there were but two persons bidding at said sale, one of whom was the defendant, William B. Moses, and the other a party unknown, to complainant, who drove up to the place in a closed carriage about the time of its commencement, and who remained seated in the carriage, and between whom and Moses, the said Duncanson, the auctioneer, was passing and repassing while the auction was proceeding; that the party in the carriage, if he bid at all, gave his bid to Duncanson while the latter was standing at the carriage, but no audible bid was made by said party; but after going to the carriage Duncanson would return to the vicinity of Moses and continue the auctioning of property; that finally Moses said to Duncanson, after making his last bid : “Now, I am done, knock it off,” and almost immediately thereafter Duncanson declared the property sold to the said William B.- Moses for the sum of $97,800 ; that by the time the sale was declared to be made it had become quite dark; that at no time during said auctioneering did Duncanson mention said property as being in value in excess of $100,000; that the sum for which property was declared to be sold was a grossly inadequate *459 price for the same, and was only about $2,000 in excess of the deed of trust, judgments, and the costs of said sale. That the property is situated on Vermont avenue, between L street and Thomas Circle, one of the most desirable residence localities in the city of Washington, and is worth not. less than $150,000, and in the estimation of persons well acquainted with real estate in the city, and competent judges of the value thereof, was worth $175,0.00; that the-alleged sacrifice of the property for an inadequate sum was caused, among other things, by an unlawful combination, and conspiracy between the trustees and Moses and Duncanson as auctioneer, and other persons whose names are-unknown to the complainant, by which the bidding was to-be so controlled that the property was to be declared to be-sold for an inadequate price; that all the defendants were-inimical to him, and that Duncanson was selected as auctioneer by Mdses and the trustees, with knowledge of such animosity on his part; that Moses held several judgments, which were liens upon the property subsequent to the deed of trust, some of which he had purchased, and that Duncanson had an interest in part of said judgments.
These charges of conspiracy, and of all misconduct on the part of either of the defendants are positively denied in their answers, which, briefly stated, set forth that the-sale was advertised to take place at 4.30 p. m.; that the weather was clear and pleasant; that as soon as ten minutes before five o’clock p. m., a large number of people, including many capitalists, had assembled; that the sale was in all respects properly conducted ; that there were several bidders-up to about $87,000, after which the bidding was confined to Mr. Moses and Mr. Richmond, a- capitalist oí Philadelphia, who was the person referred to as seated in the carriage,-and who was in attendance in response to a telegram from the trustees; that they believe the price obtained was-a fair one; that the conduct' of the several defendants in all particulars was correct and entirely unaffected by any *460 supposed feeling of animosity towards the complainant; that Duncanson more than once mentioned that the property had been valued in excess of $100,000; and both Duncanson and Moses deny the allegation that Moses told the auctioneer to knock the property off, as charged in the ■bill.
Upon these issues a large amount of testimony was taken by the respective parties, chiefly directed to the question of value. This has been carefully examined by the justices who heard the case, and has been the subject of much consideration.
Eleven witnesses examined on behalf of the complainant, and seven produced by the defendants, gave their opinions as to the fair value of the property on the day of sale. They were for the most part real estate agents, engaged in the purchase and sale of land in this city, and so far as we ■can judge from their testimony, were men of intelligence. The usual and proper mode of arriving at a correct result is, from such a mass of variant testimony, where the opportunities and character of the witnesses are equally good, to ascertain the average of each set of witnesses, and the general average, derived from all on both sides. This we have done in several forms:
The aggregate of the valuations given by the witnesses for the complainant, carefully corrected, is............................................... $1,602,550
Aggregate of defendants’witnesses................. 680,900
2,283,450
Average of all the witnesses.................... $126,852
Amount of Moses’ last bid.......................... 97,800
Insufficiency by this test..................... 29,052
*461 The average of the valuations given by the complainants’ witnesses is.............................. $145,686
Amount of last bid.................................... 97,800
Insufficiency................................... 47,886
Average of defendants’ witnesses .................. $97,271
Last bid.................................................. 97,806
By this test the property brought above its value the sum of.................................... 529
The difference between the general average of all the testimony, and the amount of the last bid exceeds by $4,608, one-fourth of that bid, and is only $3,542 less than one-third of that bid. Even this view is too favorable to the purchaser; for there are several reasons why the estimates of all of the defendant’s witnesess should be regarded as less satisfactory than those of all the other witnesses ; for example, two of the most important of those witnesses, Duncanson and Tyler, are parties defendants, whose action is under examination ; and their estimates might properly be laid aside with those of Taylor and Moses.
Snyder, another of defendant’s witnesses, who gives the lowest estimate, had never examined the property.
Duncanson, who now estimates the value as $97,800, in December, 1888, gave a certificate that the property was worth $150,000 ; and this estimate was then assented to ás correct by Fitch, Fox & Brown, one of whom is now a witness for the defendants.
Waggaman, who now estimates the property at $97,800, on another occasion certified it was worth $125,000; and Wimer, whose estimate is $100,000, certified it was worth $150,000 a year or two since.
The evidence shows that Mr. Moses, the purchaser, shortly before the sale began, said he would not be surprised if the property brought between $80,000 and $120,000, and he *462 testified lie had told a great many persons it might go at •$80,000 or $120,000 or $125,000; and the next day he told Duncanson he would transfer his purchase for $110,000, if the money was paid without his going to any expense or trouble.
■We think there can be no question the testimony clearly •showed the sale was made for an inadequate sum. Even if we ascribe no greater value to the testimony of the witnesses of the defendant than to those of the complainant, and concede all to be equally entitle to respect, we must still declare the decided preponderance of the proof to be against the sufficiency of the amount bid. '
The familiar rule respecting the effect of such testimony upon the question of the rescission of a sale, as stated in 7 Gill, 290, Johnson vs. Dorsey, is that mere inadequacy of price in a chancery sale, where it has been made conformably to the powers and directions specified in the decree, is not of itself sufficient ground for vacating the sale ; and that it is only when the inadequacy is so gross as to shock a correct mind, and furnish a presumption of fraud or of misconduct in the trustee, that mere inadequacy will justify •a court in vacating such a sale. “ But it is certainly true,” says the court, in that case, “ that inadequacy of price is to be regarded as a strong auxiliary argument, in combination with circumstances calculated to cast doubt or suspicion on the correctness of a sale.”
The counsel for the defendants have referred to several cases in which the courts refused to set aside sales where the percentage of loss was greater than that shojvn here. But we do not understand that the importance of the inade■quacy proved is to be estimated or controlled by the consideration of percentages alone. The courts have declared that each case is to stand on its own facts; the question to he decided being whether the parties interested in the property have received full justice by its sale under the circumstances. In the case before us, by the terms of the deed, *463 the grantor, his representatives or assigns, was entitled to r'e■ceive whatever might be realized from the sale after paying the debt named in the deed, with the proper costs and expenses; and estimated by the testimony of his witnesses, his pecuniary interest in the fair market value of the propi erty was greatly in excess of the interest of the creditor at whose instance the sale was made.
The actual amount lost by an improvident sale is therefore an important consideration. In Cohen vs. Wagner, 6 Gill, 236, the difference between the proved value and the best bid was $8,000. In Johnson vs. Dorsey, 7 Gill, 269, the difference was $7,577.89. In 38 Md., 91, the difference' was $3,550; and in the Iowa case, also cited by the defendant, the difference was about $4,655, and the same was the case in the Ohio decision. But the loss here appears to be upwards of $29,000, a very considerable sum, actually or relatively to the value of the property, and exceeding the amount involved in four-fifths of the suits in this court.
If a great estate were struck off at $1,000,000, and it were clearly proved its fair market value was $1,250,000, we cannot believe a court would refuse to order a.resale because the loss to the owner was only one-fifth of the proved value, notwithstanding the difference shown represented a considerable fortune, even in these days. Without deciding that the insufficiency of price disclosed by the testimony in this case is so great as to amount to the “ gross inadequacy” referred to in the books, it is yet so serious that we must be satisfied the other charges of irregularities and improvidence in the conduct of the sale are not sustained by the proof, before the court can agree to confirm it.
The sale in this case was not made under a decree in chancery, but under a deed executed by the complainant that empowered the trustees, in default of punctual payment of the principal or interest of the debt therein named, to sell the premises, or so much thereof as may be necessary, on such terms and conditions, and at such time and place *464 as to them “ shall seem most for the interest of all parties concerned; with power to repeat or postpone such sale as to the trustees shall seem most for the interest of all parties concerned,” and after the discharge of taxes, insurance and interest, and of the debt secured, to pay over the surplus to-the grantor and his representatives or assigns.
The obligations of such trustees to protect the interests of the debtor, as well as the creditor, are not less than those-devolved upon trustees under chancery decrees. Indeed,, the courts have sometimes seemed to consider such trustees-as more specially obliged to protect the interests of all concerned than if they had been appointed by the court after resistance by the debtor.
In such case, “the trustees are bound by their office to sell the estate under every possible advantage for the beneficiaries, and if there are different cestui que trusts, they must act with a fair and impartial attention to the-interests of all. If the trustees, or their agents, fail in reasonable diligence in inviting competition, or in their management in relation to the sale; or if they contract under circumstances of haste and improvidence; or if they contrive to advance the interests of one party at the expense of another, they will be personally responsible to the injured party for the loss, and the court v?ill refuse to decree a specific performance, though the purchaser was without fault.” Perry on Trusts, Sec. 770.
And in Gould, Trustee, vs. Chappell, 42 Md., 473, the court, after quoting the rule in Johnson vs. Dorsey, 7 Gill 269, says: “Where, however, a sale is made under a deed or will, and the trustee is clothed with large discretionary powers iii regard to the time, manner and terms of sale; such a sale being coupled with a trust, it is the duty of the trustee to bring the property to the hammer in a judicious and advantageous manner; and if he fails to exercise that caution and prudence which may fairly and reasonably be expected from a prudent owner in regard to the sale of his *465 own property, and in consequence thereof the property is sold at a depreciated price, a court of equity will not sanction such a sale, even though the conduct of the trustee be untainted with fraud, and the purchaser be without fault.”
We proceed to examine the specific objections presented by the complainant, which he insists contributed to the inadequacy of the bid accepted by the trustees.
Objection is made to the lateness of the hour at which the sale took place. It was advertised to begin at 4.30 on the afternoon of December 7. The sun sets on that day, according to the almanac, at a few minutes after 4.30. It is admitted the sale did not begin until ten or fifteen minutes of 5 o’clock, nearly a quarter of an hour after sunset. Without any explanation, by the trustees, the best quarter of an hour of the fading twilight, after the time fixed for the commencement of the sale, was wasted in needlessly ringing the bell. The sale ended at or near half-past five in absolute darkness. The property, in front of which the auctioneer and company assembled, lies on the western side of Vermont -avenue, which would naturally be. more in gloom than the opposite side of the street. Perhaps the testimony of Mr. A. C. Bradley describes more succinctly than any of the complainants’ witnesses the circumstances under which the sale took place.
He testifies he was present when the sale began. “ I noticed but one bidder that I am sure of; that was Mr. Moses. There appeared to be a bidder in the carriage. The auctioneer appeared to receive bids from the party in the carriage, which he announced from time to time, indicating by a motion of the head that 'the bid came from .the carriage, and the auctioneer, I know, left the position which he occupied while he was crying the sale on several occasions and went to the door of the carriage, and apparently held a long conversation at one time I remember, with the *466 occupant or occupants. ’ I did not see who was in the carriage. The fact is, when the sale was closed it was so dark ■that no one sitting in the carriage could have been recognized, I think, unless the person seeking to recognize him had put his head inside of the carriage door.” Complainant’s testimony, page 107.
“ It was so dark that you could not see ; as Mr. Duncan-son remarked at the time that he could not tell, from where he stood, what sign the party in the carriage was making, and he had to go cleár to the carriage to find out.” Page 111.
“ When Mr. Moses returned from the carriage, and either before or after he had made the last bid, on which the property was knocked down, he stated to me, I thinkpn answer to a question as to the party in the carriage — I do not remember what the question was — that he had bluffed him off. I will not be positive that that is the exact expression that he used, but I think those were the words lie used, lie conveyed to me in language, however, that he had bluffed him off.” Rebutting evidence, page 63.
Duncanson’s question to this witness seems to admit the correctness of Bradley’s statement as to him; and although Moses denies he used the expression as to bluffing the man off, Bradley positively reiterated it.
Moses testified he never say either of the parties in the carriage before he went to the carriage to speak to them ; that he said to them : “ Gentlemen, if you want to buy this property for a fine improvement let me know, and I will not bid against you. If you don’t, I don’t know what I will do. I may have asked the gentlemen in the carriage who they were.”
“I said to the auctioneer after my last bid,.‘Hurry up and get the $25 or strike it off’ He was then asking for a $25 bid. Pie had been dwelling from three to five minutes trying to get a bid.”
rPhere can be no question that the hour appointed for *467 the sale was most inappropriate. Even if the trustees could have been certain the sale would be completed in a few minutes, the time would have been inopportune; for the hour named, on a winter’s day, is too late for the usual class of bidders at such sales to transact out-door business involving standing still in the street for even a short time. But it could not be assumed that this valuable property would be sold as rapidly as a cow or a little shanty, and naturally the offerings ran on into the night, when (as Mr. Moses testifies), it was cold as well as dark. The property was of a character to invite the attention of capitalists, and such persons are usually individuals rather advanced in life, who would consider it very unwise to remain standing ■out of doors at that time of night in winter on the pavement. The hour announced was therefore in itself calculated to deter the attendance of bidders. Sales are constantly postponed on account of inclement weather; but a rain or snow at midday would scarcely be moi'e dangerous ■to the health of delicate persons than such an exposure in the ■evening, even of a clear day, in December. It is the experience of most people that not infrequently the purchasers at ■sales are persons who may be accidently passing and who make bids without previously intending to do so. But no such bids could have been expected from that class of persons at an hour when it was too dark even to see the house or examine the boundaries of the premises.
Again, the requirements of a public auction was practically nullified by a sale made upon biddings by persons whom no one could see, and who could only be communicated with through a private interview with the auctioneer. No other bidder would feel encouraged to compete with an unseen person, concealed from the knowledge of' everybody who would not feel disposed to follow Mr. Moses’ lead in putting his head into the carriage and asking the name of the occupant; and persons thinking of purchasing would literally be left in the dark, uncertain whether, on the one *468 'hand, the alleged bidder was a rich man, determined to buy the property at any price, and against whom it would therefore be useless to bid, or on the other, a straw bidder put up to toll real bidders to higher offers.
The persistence of the auctioneer in knocking off the property at such an hour was not necessary; since the trustees had the right to adjourn the sale to the next day at a suitable hour or to a later time, by making proclamation of .the adjournment, or by advertising the postponed sale by a notice shorter than that required by the deed of trust.. Bloom vs. Railroad Co., 3 Wallace, 196; Richard vs. Holmes, 18 Howard, 147.
In the case last referred to the trustees adjourned the sale twice on short notice; and the last time to the rooms of the auctioneer, where the sale took place.
For how long a time was the offering to be carried on, if the biddings had continued? If Mr. Richmond had seen fit to persist in his bids, was lie to be shut off and allowed less time to compete than is usually given in sales of smaller importance? And if the customary indulgence was extended to bidders, was the sale to be kept up until 8 o’clock or indefinitely? The selection of such a late hour for the commencement of the sale involved, just such difficulties. On such an offering it was impossible that there could be any real competition for the property.
In Freeman on Executions, Sec. 267, it is laid down generally that the hour selected by the sheriff for a sale should not be earlier than 9 o’clock in the morning nor later than sunset; and if the sale cannot be completed by sunset, it should be adjourned to the next day by proclamation made in the presence of persons in attendance.
Rohrer on Judicial Sales, Sec. 1032, says: “The sale is to be made during the business hours of the day. An execution sale made out of business hours, as, for instance, -after-sunset, is void.” Although these statements are couched in general language, the reference to Crocker on Sheriffs *469 shows the statement in the text is based upon Carrick vs. Myers, 14 Barb., 1, where a sale after sunset was held void, under a statute of the State of New York. But the enactment of such a' statute in itself is evidence of the opinion in that State of the propriety of so sensible a regulation. In Illinois a sale made at 4 o’clock in the morning was held voidable, in Rigdon vs. Smalls, 60 111., 416, under a statute which required sales to be made between 9 o’clock and sunset of the same day.
The exposure of the property for sale at so unsuitable an hour necessarily engendered that “ haste and improvidence,” which the authorities, say will prevent the ratification of the sale. At the last, one is not much surprised to find Mr. Moses, hungry and cold, as appears by his own testimony, calling out to the auctioneer, according to one witness, “ hurry up and get your $25 or strike it off;” or, according to Bradley, “I am through, Charley, knock it down;” and this occurred after no longer time had been spent in crying this valuable house (required by the deed of trust to be insured for not less than $27,000), with 34,000 square feet of ground, on one of the most prominent avenues of the city, than might be consumed in selecting a set of furniture or a suit of clothes.
In our opinion it was a grave mistake on the part of the trustees to have offered the property at the time and struck it off in the .manner shown by the evidence. Although they were intrusted with a discretion as to the manner and time of making the sales, yet in the words of the court, in Gould vs. Chappell, 42 Md., 470, “It was not a mere arbitrary discretion, but a discretion coupled with a trust, and to be exercised solely for the benefit of the cestui que trust. It was their duty, therefore, in making a sale of the property to act in a prudent and business like manner with a view to obtain as large a price as might, with due •diligence and attention, be fairly and reasonably obtainable under the circumstances; in other words, to exercise that *470 diligence and caution which a careful and prudent owner would observe in the sale of his own property. If the sale be made under circumstances of haste and imprudence, or if the trustees fail in reasonable diligence in inciting competition or adopt an injudicious and disadvantageous mode-of selling the property a court of equity ought not to ratify the sale.” Ord vs. Noel, 5 Madd., 438.
Without going into an examination of the other alleged irregularities on the part of the trustees and of the auctioneer and purchaser, relied on by the complainant, we are of the opinion that the unsuitableness of the hour at which the sale was begun and accomplished is, in the language of the authorities, “a circumstance calculated to cast suspicion on the correctness of the sale,” and that the great inadequacy of price established by the evidence is “a sufficient and strong auxiliary argument” for granting the-motion that the sale should be set aside and rescinded.
In the recent cause of Cowling vs. Cowling, this court annulled a sale reported by trustees of a property on G street-, near the Church of the Epiphany, where the inadequacy shown was much less in ratio and in amount than appears in this case; it further appearing that the exceptants and the others interested, relied upon an agreement with the other heirs that the property in the county should be sold before the sále of the city property.
In Homiller vs. Homiller, this court, at this term, set aside-a sale made by chancery trustees, upon proof of deficiency of price much less than that shown here; it being also-shown that the land was sold in an entire field, instead of in small lots, although it was situated within the northern limits of Georgetown ; and the court believing the interests-of the parties requiring it should be sold in parcels.
The decree dismissing Taylor’s bill, No. 11,509, is reversed and the cause remanded to the Equity Court for further proceedings.
In remanding these consolidated cases, we think it *471 proper to express our opinion that this property, when offered for sale again should be set up in parcels, according to the subdivision by George Taylor in the recorder’s office. Two or more of those sub lots, however, may be sold together if the trustees shall think that for special reasons affecting those particular lots, an offer in that form may be requisite to obtain the best price for such lots. But with this exception the sale in separate lots should be adopted. To obtain the benefit of both methods, the trustees may first offer the property (as far as they may deem best, as before explained) in separate lots; after previous notification that when all the lots have been struck off, the entire property will be offered in a body at the aggregate of all the bids and will be struck off in that form to the highest bidder for'a sum exceeding such aggregate.
We are also of the opinion that the Equity Court should, by decree to be passed in these consolidated cases, direct the sale to be made by two or more trustees, to be appointed by the court, representing the creditors in each of the said causes, and also representing the interests of the said George Taylor; said trustee to give such bond as may be required by the court, and to report their proceedings to the court for its ratification.
The exceptions to the Auditor’s report, certified to he heard here in the first instance, are necessarily disposed of by this decision.
It folloios that the case certified here, involving the proceedings, under the Landlord and Tenant Act, No. 30,007, at laxo, of Moses vs. Taylor, to obtain possession xmder the sale must be dismissed.