EDMUND JACOBS *v.* M. W. SMALLWOOD,*

The *Stay Law*, contained in the Ordinances of June 1866 and March 1868, impairs the obligation of contracts, and is therefore void.

*Semble*, that the provision for a Homestead in the present Constitution of the State, is not unconstitutional, and has a *retrospective* effect.

*Per* RODMAN, J., *dissenting.* The *Stay Law* is not unconstitutional.

DEBT, tried upon demurrer, before *Buxton, J.,* at Spring Term 1868 of the Superior Court of NORTHAMPTON.

The suit had been brought in the County Court, upon a bond dated on the 29th of May 1867   The defendant pleaded to the jurisdiction, on the ground that the bond declared on had been given *in renewal* of a debt contracted before January 1st, 1865.   To this the plaintiff demurred.

In the County Court the demurrer was sustained.   Upon appeal his Honor below overruled the demurrer, *pro forma*, and the plaintiff appealed.

It was agreed that if the demurrer were sustained, judgment should be rendered for the debt declared upon.

*Smith, Barnes and Yeates*, for the appellant.
*Peebles & Peebles, contra.*

READE J.   It ought to be, and it is with us, the gravest duty, to decide between the Constitution and a legislative enactment.   It is settled that whenever such a question arises, every reasonable presumption is in favor of the validity of

*NOTE.—This case and the five next succeeding, are the STAY LAW cases.   The opinion in the present case covers all.

the enactment, and against the alleged repugnance. Nor is it ever to be presumed, that the Legislature *intends* an infringement of the Constitution, even when the infringement is palpable; but it is to be set down to inadvertence, or mistake, or unconscious bias from pressing circumstances. The duty is not only grave but painful, when great public interests are involved, or the public mind is excited and anxious by reason of the multiplicity of individual interests which are at stake. But still the Judge has but one guide—*duty*. To maintain and enforce legislative enactments is important, but to maintain and defend the Constitution is paramount.

The Constitution of the United States provides that "no State shall pass any law impairing the obligation of contracts."

The obligation of a contract is, *the duty of its performance*—of a full and complete *compliance with its terms.*

Any statute which relieves a party from this duty, or enables him to evade it, is void.

An occasional, if not a frequent recurrence to fundamental principles is useful. Let us, therefore, consider *why* it was thought necessary by those who formed our government, to make this provision in the United States Constitution. Every word of that instrument was well-considered; every principle was founded in patriotism and virtue. Those who had fled from error, and staked all for truth and justice,—great and good men! framed a government in which virtue and intelligence were to be the powers, and the only powers; capital, privilege, monopoly, rank, had had their day, and were discarded. Upon a new soil and in fresh clime, a government was inaugurated, founded upon the virtue and intelligence of those who were of it. Very few were rich; the masses were poor; and those who were expected to come under it by immigration were to be poorer still ; and the whole body were dependent upon industry and integrity for prosperity. Under these circumstances, what was necessary for the business and prosperity of the community ? If it had been left to the control of capital, the few who had it would have had a monopoly, and

8

industry and enterprise would have been paralyzed.   To prevent this, integrity was put in competition with capital—indeed almost to supply its place.   Every man's word was to be his bond, and every bond—every contract—was to be inviolable.   Not only was the capitalist assured that, if he would venture his capital for the interest of the community, he should have every guarantee for its safety, but the laborer was assured that industry, should have its reward; that in the absence of capital to "pay down," industry and enterprise need not falter, because a *promise* of reward should never be evaded or impaired.   It will be seen, therefore, that the provision was not so much for the protection of capital, as for the encouragement of industry and enterprise.   It was a guaranty of justice to all, and is expressly so against him who would obtain the profits of industry, and withhold the reward.   It is a provision in favor of industry and honesty, and against idleness and treachery.

Probably the wisdom of our ancestors could not be more clearly vindicated than it is by the circumstances which now surround us.   Let it be supposed that there are in the State 200,000 persons acting for themselves: one-third of them, the colored portion, are neither creditors nor debtors to any considerable amount, and are dependent upon their labor for subsistence; and that depends upon the inviolability of contracts. Another third, one-half of the whites, are small farmers and laborers, dependent upon the rewards of industry.   The other third may represent the creditor and debtor classes.   Of these there are, doubtless, meritorious cases on each side:   On one side there may be the exacting Shylock creditor, and on the other the exhausted, unfortunate debtor; on one side there may be the widow or the orphan creditor, and on the other the showy, spendthrift debtor.   It is impossible to make general rules to fit these individual cases; and it was wise to leave the contract inviolable, and the hardships to private adjustment.   Probably the attempted interference in favor of one class against the other, has held out false, not to say unjust hopes, and has prevented the private adjustments which might have

been made.  As it is, we find that eight years · of stay laws have left a considerable indebtedness, with interest and cost accumulated, and creditors and sureties impoverished, without any corresponding benefit to the principal debtors; some of whom cannot pay, and have sought relief from the Bankrupt law; and some have delayed, and have now lost the opportunity for that relief, by reason of the false hopes held out by the stay law; and some of whom will not pay, although their means are abundant, and are used in speculation and extravagance.

Again: it was very well known to those who framed our Constitution, that with the most prudent and honest purposes, persons would sometimes become involved beyond their ability to pay, and that it would be crippling industry and enterprise to afford them no escape from misfortune; and, therefore, the same Constitution, which makes contracts inviolable by State laws, provides for a General bankrupt law, by means of which a debtor may be absolved from his debts and take a new start.

Again: the laws, while they provide for the enforcement of contracts, are not used to the extent of oppressing the debtor, for there have always been exemptions of what were deemed *necessaries*.  In our earlier days—times of great simplicity and small estates—we had the exemptions of wearing apparel, wheel and cards, loom, bed and furniture, &c.  As our fortunes increased, the exemptions increased, and provisions, furniture, &c., were added; and subsequently, as times and habits changed, other things were added.  All of which met the approval of the public, and was not injurious to creditors, while the debtors were not reduced to want, nor left to broken spirits.

*Now* there is a commendable spirit, which finds expression in our new Constitution and in our legislation and in popular approbation, to allow homesteads; for truly we may say, why allow a bed, without a shelter to keep off the rain !

But exemptions and homesteads on the one hand, and stay laws on the other, are very different things.  The former allows a man to be comfortable and honest, and encourages

industry, while the latter enables him to be profligate and dishonest; the former is for all, the latter for a favored few.

There has been no case before us requiring the decision of the question, whether the provision for a homestead in our State Constitution is in violation of the Constitution of the United States. And although the advice of the Supreme Court was requested by resolution of the General Assembly, yet the Court is so constituted, that we have not felt at liberty to deliver any authoritative opinion upon the subject. But the fact may be stated, that our new ·Constitution was approved by Congress, with that provision in it; and it is not to be supposed that it would have been done, if it had been thought to be in violation of the Constitution of the United States. And it is settled, that every presumption is to be made in its favor; as having the approbation of the Convention of the State, and of the Congress of the United States. And it may be repeated that exemptions have always existed, not to any considerable amount, to be sure, but still, in increasing amounts, keeping pace with the change in manners and customs, and the condition of the country. If an exemption of the value of $100 was *necessary* in our infancy as a people, with the simplest habits, and fell under the maxim, *de minimis non curat lex*, it may be that the exemption of a homstead of $1000 value will be deemed less considerable *now* than $100 then. And it has the sanction not only of Congress and of the State Convention, but of the liberal spirit of the times as well. And it may well be supposed to be the earnest wish of the Government in all its departments, and of every enlightened and benevolent citizen, to see every man with a home for his wife and children, a home to adorn and to love—*his* home, his *castle*—" from turret to foundation stone ."

Although we are not permitted to declare our *decision*, in advance of a case between parties which may come before us, yet a measure which has the sanction of the State Constitution, of Congress, the guardian of the United States Constitution, and of an enlightened public sentiment, and which is

founded on justice, and which gives to every man a home from which he cannot be driven, may well be supposed to find favor with the Court, no member of which has intimated an unfavorable opinion. If such should be the case, then every man will be saved from oppression. And, in the absence of any stay law to prevent, every man will be obliged to do justice to his creditors, by surrendering to the satisfaction of his debts so much of his property as is not exempted as his homestead.

We have been thus full in what may be regarded as an unusual discussion of the subject by the Court, because we are aware that the effect of our decision will be felt very far beyond the case before us; because of the anxious state of the public mind; and because, in declaring invalid a measure which was intended to afford relief, but which was not only invalid but mischievous, and gave a stone instead of bread, we are anxious to relieve the public mind by directing attention to a measure—the Homestead—which may enure to the benefit of all.

We come now to the question: Does the ordinance, which we are considering, impair the obligation of contracts?

We do not propose to *labor* the subject. It is plain and incontrovertible. And the learning upon it is abundant and common. *Barnes* v. *Barnes*, 8 Jon. 366.

We are obliged to concede that it was not the *purpose* of the Convention to impair the obligation of contracts, both because that is not to be presumed in any case, and because a different purpose is expressly declared. And we are to take the declared purpose as the real one. The purpose declared is, "to change the jurisdiction of the Courts," &c. To do that, is quite within the province of legislation. But while pursuing that legitimate object, it turns out that the *effect* was to impair the obligation of contracts—a consequence which, as we are to presume, was not foreseen, and is to be set down to inadvertence, or the unconscious bias of pressing circumstances and As soon as it is discovered that the *effect* is to violate the Constitution, no doubt the Legislature and every citizen will

sustain the Court in its purpose to maintain the Constitution.

The second section of the ordinance of the Convention of 1865–'66 entitled "An ordinance to change the jurisdiction of the Courts," &c., as amended by the Convention of 1868, (to be found appended to the Code,) provides that all contracts, without regard to the terms of payment made by the parties, shall be payable in four annual installments. Now if the terms of the contract be that it is all payable at one and the same time, and the ordinance changes the payment to four different and distant times, it is a material alteration, and impairs its obligation.

Section sixteen provides that the second section shall not apply to debts contracted since May 1st, 1865; so that the second section is liable to the two-fold objection of discriminating between classes, and of altering the terms, of contracts, and thus impairing their obligation, (1) as regards the particular of the time of payment, and (2) as regards the particular of the remedy for enforcement—alterations, not immaterial and reasonable but material and unreasonable.

There are several cases before us, of which this Opinion is decisive. The particular point presented in this case is, whether a bond given since May 1st, 1865, in renewal of a debt before that time, could be sued on in the County Court (this suit having originated in the County Court.) The defendant pleaded to the jurisdiction, and the plaintiff demurred, and his Honor overruled the demurrer and sustained the plea. In this there was error. According to the agreement of the parties, judgment will be entered here for the plaintiff, for his debt and interest.

RODMAN, J., *dissentiente.* I am compelled to dissent from the opinion of the majority of the Court in this case.

The question presented is, whether the Ordinance of the Convention of North Carolina, ratified on the 14th of March 1868, entitled "An ordinance respecting the jurisdiction of the Courts of this State," amending "An ordinance to change the jurisdiction of the Courts and the rules of pleading

therein, " adopted June 23rd 1866, is void, by reason of a con-
flict with the Constitution of the United States, which pro-
hibits any State from passing any law impairing the obliga-
tion of contracts.

The diligence of the counsel who argued on the opposite
sides in the several cases in which this question has been pre-
sented, has probably furnished us with all the cases, in which
similar questions have been discussed, which would aid us in
our investigation.   None of them are exactly in point, and I
shall not undertake to review them.   These principles may be
taken as clear, or as conceded for the purposes of this case:

1. No State can constitutionally pass any law invalidating
a legitimate contract: subject to some qualifications, which
will be presently adverted to.

2. The remedy for the enforcement of a contract is a part
of the contract *quodam modo :* that is to say, it is so, at least
to the extent, that any law which deprives a creditor of all
remedy, or of all but such as is merely illusory, impairs the
obligation of the contract, and is therefore unconstitutional.

3. The States may constitutionally alter and modify the
remedies for breaches of contract; but if it can be seen that
the statute is not directed in good faith to the regulation of
the remedy, but designedly impairs the obligation of the con-
tract, it is unconstitutional and void.    Cooley, Const. Lim.
287, 289.

It is not contended by any one that the remedy is so com-
pletely a part of the contract, that no change at all can be
made in it.   The consequences of so extreme a doctrine would
make it absurd.    Cooley, Const. Lim. 361.    But it is con-
tended for the plaintiff in this case, that if the remedy be so
changed as *materially* to impair its value to a creditor, the
obligation of the contract is thereby impaired, and the statute,
changing the remedy, is void.   This doctrine may be conceded
partially, and in a certain sense, viz: that the legislator should
take care not to violate the spirit of the Constitution; but the
question would still remain open, whether the principle is

capable of being reduced to the certainty necessary to make it available for judicial application.

Even as thus limited by conceded principles, the area of doubt and discussion is left sufficiently wide. The questions remaining open may be stated thus:

1. When a Legislature has set forth in a statute that its purpose and intent was to change the jurisdiction of the State Courts, and to alter the modes of procedure, can any Court pronounce that declaration false, and that the real purpose was to impair the obligation of contracts?

2. Is it possible to draw a reasonable line between such modifications of the remedy as do, and such as do not, so materially impair the remedy, as to impair the contract; which line shall be so definite and certain, as to enable a Court to declare those on one side of it constitutional and valid, and those on the other side, unconstitutional and invalid?

3. How is that line defined?

4. On which side of it, does this particularly enactment fall?

I do not propose to discuss these questions *seriatim*. Observations on each separately would run into each other, and lead to useless repetition. But it is well to see the stages which must be passed, and the conclusions which must be arrived at, before the Court can declare the ordinance invalid.

A few general observations on the difference between the obligation of a contract, and the remedy on it, although not bearing very closely on the particular question, will not be useless as an introduction to it. A contract is personal; it follows the person of the debtor, and wherever made, can be enforced in the Courts of the country in which the debtor may go to reside; it must be construed according to the law of the place of contract, and if invalid there, or impressed by law with a certain meaning, it will be invalid, or impressed with that meaning everywhere. 1 Robinson Pr. 68.

The remedy, on the contrary, is local,—it must be that which is given in similar cases by the law of the country where the suit is brought. The period of limitation, and the

liability of the person or property of the debtor, are parts of the remedy; and although these may materially vary in the country where the action is brought, from those of the country of the contract, yet the creditor can have no others than those given him by the law of the place of action.

To revert to the first of the questions proposed above. In a discussion in this Court of that clause of the State Constitution which forbids the Legislature from incurring any new debt for the State (except in certain cases,) until the bonds of the State are at par, it was asked by one of the counsel *arguendo*: suppose that the Legislature, in an Act which would otherwise be in contravention of that clause of the Constitution, should declare that the State bonds were at par, when it was notorious that they were not; could any Court of the State listen to a suggestion that such legislative declaration was false, and inquire into the truth of it, and upon finding it false, declare the Act invalid because of such falsehood? Probably in the case of a private Act, the Courts might inquire into the truth of a recital, and refuse to give the Act effect, on the ground that it had been procured by fraudulent representations to the Legislature. But where the Legislature has inserted in a public Act a recital of public facts, or of facts known officially to the Legislature, or of their intent and purpose in making the law, we know of no instance in which a Court has assumed to doubt its truth. There are no means by which such an inquiry could be prosecuted, nor were the Courts of the country established for any such purpose. The Legislature is a co-ordinate department of the government with the Judiciary; their functions are distinct and independent; they are equally sworn to support the Constitution; and entitled to receive from each other mutual confidence and respect. Cooley Const. Lim. 96, 187. If it be possible to conceive that a Legislature shall ever attempt to bolster up an unconstitutional enactment, by the false recital of a fact, the remedy must be found with the people whose servants they are.

In the ordinance under consideration, the Convention

declares its purpose to be, " to change the jurisdiction of the Courts, and the rules of pleading therein. "

But notwithstanding the concession of a legitimate purpose to the Legislature, it may fairly be contended that it has made so material a change in the remedy, as *in fact* to impair the obligation of the contract. It cannot be said that the ordinance in question destroys the remedy of a creditor, and it must equally be conceded that it considerably retards it. We are compelled, therefore, to consider the extent to which the admitted power of the Legislature to modify the remedy is abridged by the constitutional limitation upon that power, viz. that the modification shall not be so great as to impair the obligation of the contract; and consequently, to consider also, whether it be possible and competent for a Court, to draw the line between a legitimate and an illegitmate exercise of the power over the remedy.

It must be remembered, that to every contract there are at least two parties, an obligor and an obligee, who assume by the contract mutual duties. In the ordinary case of a promissory note, which is probably as nearly unstable as any contract which can be suggested, the maker agrees to pay a certain sum, at a certain time and place, and the payee impliedly promises to receive that sum in the lawful currency, and to discharge the maker from further liability, by a surrender of the note, or by a receipt, or in other sufficient way.

If the existing remedy be considered a part of the contract, so that it cannot be altered materially to the detriment of the creditor, it must also be so considered in reference to the debtor, and it cannot be materially altered to his detriment; if the remedy cannot be retarded, it cannot be accelerated; if property liable to execution at the date of the contract cannot be lawfully exempted, property which was exempt cannot be subjected.

We will refer here to some examples, where the Legislature, in the exercise of an undisputed power has dealt with contracts, so as directly to make some valid, which before had no legal existence, and to destroy some, which when made were.

lawful and binding.   As examples of the first class; it seems.
to be settled law that a Legislature may pass retrospective
laws.   Many illustrations are given in Cooley on Const. Lim..
pp. 369, 383, which it is unnecessary to do more than refer to.
But a more sweeping illustration may be found in an Act of
the Legislature 1865–'66, ch. 40, § 5, by which it was enacted
that all freedmen and women who had been living together as
husband and wife, prior to emancipation, should henceforth be·
husband and wife, and imposed penalties on them if they failed
to register themselves as such..   It must be understood that,
their previous cohabitation was merely concubinage, and the·
Legislature interpolated into the terms of their contract, what-·
ever they might have been, all the incidents of a valid mar-·
riage.

As examples under the second  head, we need only to refer·
to the class of cases, in which a contract at the time it is made,.
is possible of performance and  lawful, because consistent with.
public policy, but which,  before the  time of its performance,.
becomes impossible and unlawful, through a change in the pub-·
lic policy and law.   Broom's  Legal Maxims, 240, 241, and
cases  there cited.   2 Thomas's Coke, 21, 206 a.   *Brown* v.
*Mayor, &c., of London*, 9  C. B. N. S. 726, (99 E. C. L. R., S..
C. 106 E. C. L R. 828.)

A striking instance will be found in the change of the policy
of North Carolina (as well as of other States) on the subject
of slavery.   In 1861, it was lawful to hold slaves, and to con-
tract to sell or let them to hire.   In 1866, a Convention of the
State emancipated the slaves, and rendered unlawful the per-
formance of all executory contracts for  their sale or hire, or
for the quiet enjoyment of those previously sold with that sort
of warranty.   Up to a certain time, the trade in slaves between
Guinea and North Carolina was lawful, and the charter of a
ship to be employed in that trade, would have been enforced.
If, while such a contract continued executory, the State of
North Carolina had made the traffic unlawful, and thereby
absolutely defeated the contract, who will say that the enact-
ment producing that result, would have been unconstitutional

as impairing the obligation of a contract; and who will say that the ordinance of emancipation is unconstitutional and void upon that ground?

I proceed now to instances in which the enactments are conceded, or have been decided, to be constitutional, although it must be admitted, that they do materially impair the remedy of creditors, and it may be contended, that they do so in a much greater degree, than the ordinance which is impeached in this case.

At one period in the history of our law, a creditor had a remedy for the collection of a debt, as well against the person, as against the property of his debtor; the debtor might be imprisoned without hope of relief, except by payment. This must at all times have been considered a very material, and, at some time, it was probably the principal, part of the remedy. This remedy was first impaired by insolvent laws, and has now been absolutely taken away by the abolition of imprisonment for debt, except in cases accompanied by fraud. Constitution of North Carolina, Bill of Rights § 16. This was constitutional, *Sturges* v. *Crowninshield*, 4 Wheat. 122.

The Statute of limitations, as prescribing the period within which a creditor must sue, must be regarded as a material part of the remedy. Yet the Legislature may shorten, or extend it, or suspend its operation for a certain time. Cooley Const. Lim, 366. *Stearns* v. *Gittings*, 23 Ill. 387. Our Legislature have repeatedly extended it for the benefit of creditors.

The property of the debtor which the law subjects to the execution of his judgment creditor, is certainly a material part of the remedy; it was probably that to which the creditor most looked, when he gave the credit. Yet exemption laws, within certain ill-defined limits, are not unconstitutional.

In 1796 the Legislature gave widows a year's support out of the personal estate of their deceased husbands, without any reservation in favor of prior creditors. Rev. Code, ch. 118, § 18.

In 1866 the ordinance of emancipation took away from

liability to the execution of creditors the whole slave property of their debtors, amounting probably to more than half the value of the whole property of the State. Shall this Act be held unconstitutional, as impairing the obligation of contracts?

We have already said that if the remedy cannot be altered to the detriment of one party to a contract, it must follow that it cannot be, to the detriment of the other. Yet can it be doubted that it would have been competent to the Legislature, had they thought proper to do so, to have extended the Code of Civil Procedure, by which the collection of debts is materially accelerated and facilitated, over contracts made prior to its ratification?

A State may legitimately alter the rules of evidence applicable to actions respecting past transactions, whether civil or criminal: Cooley Const. Lim, 367; and it may thereby, in effect, give value to contracts, which had none before, or deprive them of value. The recent legislation of this State, by which all exclusion on the ground of interest is abolished, and parties to suits allowed to testify, must have materially affected the practical value of many contracts.

If, in these instances, the legislative acts did not so materially impair the remedy of the creditor, as to impair the obligation of the contract, it is difficult to see on what principle that effect can be attributed to an act, which leaves to the creditor every remedy he had before; their operation only being retarded, on considerations of public policy. What reasonable line can be drawn, which will leave the instances I have cited on one side, and the ordinance before us on the other? If it be said that in the instances cited, the impairment of the contract was not the purpose, nor the direct effect of the Statute, but incidental merely to changes of public policy, of which the Legislature was the exclusive judge, the same may, with equal truth, be said of the ordinance in question, if we give credit to the legislative declaration of its purpose. The Supreme Court of the United States have been unable to draw any such line, or to define the legislative dis-

cretion within narrower limits, than I have here conceded. The able counsel, who argued against this Ordinance were unable to do so. And I confess I am.

In some cases, it is easy to say that the change is very slight, in others, that is very great; but at most times, when a case lies between the two extremes, it will be impossible to say whether it falls on the legitimate, or the illegitimate side. In that case, the Legislature is entitled to the benefit of the doubt. In such cases, the injunction of the Constitution must of necessity be considered as addressed rather to the legislator than to the judge; for the former has a discretion—he can abstain from doubtful ground and act on the spirit of his instructions. The right to alter the remedy, like the right of eminent domain, or to infringe on personal liberty, must depend for its extent somewhat on the exigencies and necessities of the State. The Constitution never intended any thing so unreasonable or impossible as to bind up within rigid lines, what is, in its nature, undefinable, or that the Court should measure by degrees, what, in its nature, is immeasurable.

We sit here to administer the positive law; the ordinance of the Convention is clear, and if we can not clearly see that it is in conflict with the Constitution of the United States, which all admit is the paramount law, we must give it effect.

In *Fletcher* v. *Peck*, 6 Cr. 87, Marshall, C. J., says : " The question whether a law be void for its repugnance to the Constitution, is at all times a question of much delicacy, which ought seldom, if ever, be decided in the affirmative, in a doubtful case." " It is not on slight implication and vague conjecture, that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The question between the Constitution and the law should be such, that the Judge feels a clear and strong conviction of their incompatibility with each other." See also *Cooper* v. *Telfair*, 4 Dall. 14, and *Ogden* v. *Saunders*, 12 Wheat. 213.

If it were competent for a Court, in the absence of any reasonable standard, to undertake to measure the amount of change in the remedy, which would be so material as to impair

the obligation of the contract, it would be necessary to examine as well those provisions of the Ordinance of 1868 which operate in favor of the creditor, as those which operate against him. It might even be necessary, or legitimate, to extend the investigation to other contemporaneous legislation *in pari materia*, and to balance nicely what it gives, against what it takes away. Such an investigation could lead to no useful result; starting without the guide of any definite principle, it would yield none, and would degenerate from a judicial investigation, into a consideration of the policy of the legislation. So long as it is conceded that a State can lawfully alter the remedy within the limits mentioned, I can conceive of no standard by which the degree of the materiality of the charge can be judicially measured, any more definite than that heretofore declared, which is obviously insufficient to solve this case.

With the policy or wisdom of the Ordinance of 1868, a Court can have nothing to do. This consideration, however, may be legitimately entertained: A great social and political revolution had occurred in the State; its relations with the National Government were greatly altered; a Convention assembled, not in conformity with the Constitution and laws of the State, but under the acts of Congress; that Convention acted on the idea that the fabric of the previous State government was destroyed; proceeding to reconstruct a government, it established the judicial department on a foundation altogether new, and with a new system of practice and procedure; some change in the remedies formerly in use, was unavoidable. They made such as they thought wise, and I cannot undertake to say, that in doing so, they overstepped the limits of their power.

In coming to the conclusion I have felt myself bound to, I have have not overlooked a question, which, if the Ordinance in question shall be held void, must arise. The Constitution provides (Art. v. sec. 2) that Commissioners shall be appointed, who shall report to the Legislature a Code of procedure in civil actions. That report has been made and adopted, and

the Code, by its express provisions, is inapplicable to the class of contracts embraced in the provisions of the Ordinance. If the Ordinance, by which alone a procedure is provided for that class of actions, is declared void, by what law shall the procedure in them be governed? By the old law? That procedure and the Court which administered it are abolished. By the new Code? It is expressly declared not to apply to t1em. This is not the occasion to solve these questions. They are only presented as worthy of consideration, and such as must be decided in any judgment which reaches the breadth of this subject. I only refer to them, to show that I have not omitted anything which ought to be considered in connection with the question discussed.