AUGUSTA D. KENLY v. HUNTINGDON BUILDING ASSOCIATION, INC.

[No. 50, October Term, 1933.]

*Decided January 19th, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*Maurice E. Skinner* and *Edwin W. Herrmann,* with whom were *Skinner, Herrmann & Skinner* on the brief, for the appellant.

*G. Alfin Eppley* and *Edward A. Smith,* with whom were *John A. Farley* and *S. Ralph Warnken* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

A mortgagee, purchaser of the mortgaged property at a second foreclosure sale, appeals in this case from an order setting the sale aside because of the unfavorable condition of the market and consequent low price at which the sale was made. The court, after having heard testimony on exceptions of receivers of the mortgagor company, offered the mortgagee an option of having the sale ratified upon her waiving her legal right to a judgment for a deficiency between the amount brought and the amount due under the mortgage, or of standing upon her rights and having the sale set aside unconditionally; and, the mortgagee having declined to waive her rights, the unconditional setting aside of the sale followed.

The property mortgaged consists of a leasehold lot numbered 221 to 225 West Twenty-Fifth Street, in Baltimore City, and is improved by a converted brick dwelling of three stories in height, containing a room for a bank or building association and facilities for small assemblies. The mortgage

was executed by the appellee, now in receivership, in the year 1915, to secure a loan by the appellant of $5,000 for two years, and it has been continued beyond its maturity. Interest was paid until March 18th, 1932, but not since that date, and taxes on the property are overdue and unpaid for the years after 1928. The annual ground rent is $150.

Under the decree for foreclosure, the property was first offered for sale at public auction, after due advertising, on December 28th, 1932, and, the only other bid having been one of $900, the mortgagee herself bought the property in on a bid of $950; but exceptions of the receivers to this sale were sustained by the court, without prejudice to a further sale by the trustee under the existing decree. The second sale, on April 6th, 1933, brought no new bidders, although it appears that there was a small attendance, and the mortgagee again bought the property in, this time on a bid of $1,000. The setting aside of this sale, under the circumstances recited, is the subject of the appeal.

There is no evidence, and no contention, of irregularity or impropriety in procedure in making the sale. It is insisted that the price brought was grossly inadequate, but the inadequacy is attributed only to the inopportuneness of the time for a sale. The mortgagee is also charged with laches in delaying foreclosure during the fifteen years since the principal became due and collectible, and until the present time of depression, but this, too, appears to be merely an objection to sale at this time. Foreclosure has not been delayed long after default. *Waring v. Nat. Savings & Trust Co.,* 138 Md. 367, 380, 114 A. 57. Continuation of a mortgage beyond the date specified for its maturity, and until default in the covenants, is entirely regular, and at the option of both parties, and is in accordance with common practice. *Tessier v. Wise,* 3 Bland, 28, 35. The objection is to the accident of time and conditions rather than to continuation or delay by the mortgagee. And it is on the comprehensive ground of denial of ordinary rights and remedies at this time that the decision must be based. Testimony as to the situation and condition of the property, and charges to be paid by a purchaser,

seems to this court to cast some doubt on the fundamental assumption that salability of this property at a much higher price at some future time can be regarded as assured, but it is the opinion of the court that, if this could be found as a fact, the court of equity should not for that reason interpose to deny the mortgagee her legal rights under her contract and the laws of the state.

No statute has been passed in this state purporting to prevent or delay foreclosures of mortgages; and it is the view of the majority of the judges that the court, having no actual statute in question before it, should not express an opinion on constitutional objections raised to such legislative measures. It seems sufficient for the purposes of this case that all of the members of the court are of opinion that a court of equity should not make such a departure from the law as this order involves. It cannot be disputed that, on the law as it has been laid down for the court, the mortgagee is entitled to apply her security to the debt by foreclosure sale, and by refusing to ratify the best sale that can now be made, so far as appears, and relegating the mortgagee to the chances of the future, the court seems to withhold or reject the law it has been appointed to administer. The conclusions reached, and the expedients suggested, in the Wisconsin case of *Suring State Bank v. Giese,* 210 Wis. 489, 246 N. W. 556, and in other cases which have followed its suggestions, have not been overlooked; on the contrary, they have been studied carefully, but this court has not been able to reach the conclusion that it is proper for the court of equity to make these departures from the regular course of the law. It seems to us that it is not for that court to adopt a moratorium for the legal rights of litigants. The order must be reversed, and the cause remanded for the overruling of the exceptions to the sale and ratification of it, and for further proceedings thereafter.

*Order reversed, and cause remanded for further proceedings in accordance with this opinion, with costs to the appellant.*

DIGGES, J., filed a separate opinion as follows, in which PARKE and SLOAN, JJ., concurred.

I concur fully in the conclusion reached by the majority opinion of this court for the reasons herein stated.

On May 23rd, 1933, the chancellor, in the Circuit Court No. 2 of Baltimore City, passed an order sustaining the exceptions of the appellee to the ratification of sale made under foreclosure proceedings by the appellant, who was the mortgagee and purchaser at said sale, and set aside sale. From this order the appeal here was prosecuted.

The facts which the record discloses may be briefly but substantially stated as follows: On September 18th, 1915, the appellee was the owner of certain leasehold property located on Twenty-Fifth Street in Baltimore City. On that date it borrowed from the appellant the sum of $5,000, represented by its five negotiable promissory notes payable to the order of the appellant; one of said notes being for the principal sum of $5,000, payable in two years after date, and the remaining four being for the interest to accrue thereon, each being for the sum of $150, payable, respectively, at the expiration of six, twelve, eighteen, and twenty-four months after date, the date of each being the same as that of the mortgage. As a condition precedent to the making of the loan and the repayment thereof with interest, it was secured by the execution of the mortgage. The mortgage contained the usual provisions covenanting to pay the debt and interest when due and demandable, and, upon default in any of the covenants or conditions of the mortgage, that the whole of the mortgage debt secured should become due and payable forthwith. The mortgage contained an assent to a decree by the Circuit Court of Baltimore City or the Circuit Court No. 2 of Baltimore City for the sale of the property mortgaged in accordance with the provisions of sections 720 to 732, inclusive, of chapter 123 of the Acts of 1898, or any amendments or additions thereto. It further contained provisions for foreclosure upon default, under article 66, sections 6 to 10, inclusive, of the Maryland Code of 1904. The mortgage also contained the usual covenants

for the payment of taxes on the mortgaged property, and provided that, until default, the mortgagor should have possession of the property, and the further covenant to keep the improvements on the land insured against loss by fire for the benefit of the mortgagee. The principal of the mortgage was never paid or demanded until on or about December 5th, 1932; the interest on the same having been promptly paid until September 18th, 1932. On December 5th, 1932, a petition was filed by the appellant for a decree for sale under the assent clause in the mortgage; the consent and authority having been previously acquired from the equity court having jurisdiction over the receivers for the appellee, who had been appointed as such receivers some time prior thereto. Pursuant to the decree for sale, Maurice E. Skinner, appointed thereby, made sale of the property on December 28th, 1932, and reported the sale to the court for ratification. Exceptions were filed thereto and sustained, with leave to resell the property. At the first sale, the property was purchased by the appellant mortgagee for the sum of $950; she being the highest bidder therefor. A second sale, after new advertisement, was had on April 6th, 1933, and resulted in sale to the same party at and for the sum of $1,000. Whether or not there was error in sustaining exceptions to the second sale is the question before us for decision.

The improvements on the property in question apparently consist of what was at one time a dwelling house, which had been converted by changing the internal arrangement for use as a banking room for building associations, and a hall on the second story for public or private gatherings. On the third floor there were several rooms constituting an apartment. The property was subject to an annual ground rent of $150. At the time of the decree for sale there were in arrear and unpaid four years' taxes, aggregating approximately $1,000. According to the record, there were some fourteen or fifteen persons present at the first sale, but only two bidders; the next highest bid being $925. At the second sale there were no more persons present than at the first, although this sale had been advertised for the required period

in both the Daily Record and Sun, papers published in Baltimore City. At this second sale the only bidder was the appellant, to whom the property was sold, as stated, for the sum of $1,000, although the other bidder at the first sale had been personally notified, in addition to the public advertising. The testimony of real estate experts taken in open court at the hearing on the exceptions to the ratification of the second sale indicates that in their opinion $1,500 was a fair market value of the property. The receivers, who are the exceptants, testified that in their opinion the property was worth $6,000, although neither qualified as experts on value of real property. The property was assessed for taxation at $9,500. The testimony of all of the witnesses indicates that the type and character of the building was a "misfit" in that locality. The record further discloses that the receivers have in hand or in fair prospect of collection an amount sufficient to pay the deficiency judgment which it is the purpose of the appellant to recover, that there are no other creditors of the corporation, and that, should the order appealed from be affirmed, the remaining assets of the corporation would be distributed to its stockholders.

The reasons alleged for sustaining the exceptions are that the sale was unfairly made; that the property was not sufficiently advertised; that the proceeding was not instituted in good faith; that the principal of the mortgage had been in default since September 18th, 1917; and that the price for which the property was sold was grossly inadequate.

There is no evidence whatever that the sale was not properly and fully advertised, or that the sale was not fairly made in every respect; but, on the contrary, it is abundantly shown by affirmative testimony that the sale was fairly made after full advertisement.

The question therefore resolves itself into whether the price for which the property was sold is so grossly inadequate as to be indicative of fraud, requiring the sale to be set aside. The annual ground rent of $150, capitalized at six per cent., represents a claim prior to the mortgage of $2,500, to which must be added four years' accumulated taxes, amounting in

round figures to $1,000. The purchase price was $1,000; so that the net obligation assumed by the purchaser is $4,500. There also appears from the record to have been a permanent right of way passing through the rear of the building. There is no testimony as to what this incumbrance amounts to in dollars; but it is at once obvious that the property is less valuable thus incumbered than it would be without the incumbrance. Under these circumstances I am unwilling to say that the property was sold for such a grossly inadequate sum as would require the setting aside of the sale. Especially is this true in a case like the present, where the exceptions are to the ratification of a second sale of the property, with no *bona fide* offer of an increased price, or any reason to suppose that a subsequent sale would result in a larger price. It is well-settled law in this state that mere inadequacy of price, standing alone, unaccompanied by any circumstances indicating an unfair sale, is not sufficient ground for refusal to ratify a sale. *Cohen v. Wagner,* 6 Gill, 236; *Garrittlee v. Popplein,* 73 Md. 322, 20 A. 1070; *Johnson v. Dorsey,* 7 Gill, 269; *Hintze v. Stingel,* 1 Md. Ch. 283; *Glenn v. Clapp,* 11 G. & J. 1; *Thompson v. Ritchie,* 80 Md. 247, 30 A. 708; *Noles v. Peter,* 150 Md. 700, 137 A. 916; *Lewis v. Beale,* 162 Md. 22, 158 A. 354.

But it is urged that the appellant has been guilty of laches in not foreclosing the mortgage and selling the property during the period when real estate prices were much higher and the market more active. I do not deem it necessary to discuss at length this objection except to point to the fact that the appellant evidently loaned the money for the purpose of investment, that it was an accommodation to the borrower, and satisfactory to the lender so long as the covenants of the mortgage were complied with. It is true that the appellant could have foreclosed the mortgage at any time after September 18th, 1917; but it is equally true that the appellee could have settled the mortgage at any time subsequent to that date, if it so desired, or, if the market was propitious, could have sold the property either subject to the mortgage or freed

therefrom by paying it. Under such circumstances, the length of time which the mortgagee permitted the mortgage to stand, upon the payment of interest and compliance with the covenants therein, can in no manner estop her from the full legal rights and remedies which she might have had, had she foreclosed the day after the principal of the mortgage became due.

The real ground of contention of the appellee, and that sustained by the chancellor, is that, by reason of the depressed economic conditions prevailing at the present time, and especially in respect to the real estate market, it would be inequitable and unjust for a court of equity to permit the enforcement of the legal rights of the appellant. It is contended that a court of equity has the inherent power to deny a clear legal right whenever the enforcement of such right, in the judgment of the chancellor, would work an injustice to the party against whom such right was sought to be enforced. This is an important question, perhaps of more importance at the present time than at any other time in the history of this country. There is a marked difference in the opinion of lawyers and judges throughout the country on this point, as exemplified by articles contained in legal periodicals and the decisions of the courts. In view of the constitutional mandate, as contained in the United States Constitution, art. 1, sec. 10, and article 44 of the Declaration of Rights of Maryland, which latter provides, "That the provisions of the Constitution of the United States, and of this State, apply as well in time of war as in time of peace; and any departure therefrom, or violation thereof, under the plea of necessity, or any other plea, is subversive of good government and tends to anarchy and despotism," by which the action of this court is controlled, it is our duty to protect and enforce every clearly defined legal right, and this without regard to the presence or absence of real or fancied emergencies. Courts of equity are as much bound by the Constitution and law in the enforcement and protection of clearly defined legal rights as are courts of law.

It is said that cases may arise, and that this is one of them,

where the judge who for the time being is acting as chancellor has the right, and it is his duty, to disregard clear legal mandates and give relief or prohibit the enforcement of a right, when in his judgment injustice is threatened. Such an argument is persuasive when addressed to a chancellor, and offers strong temptation to disregard the law as contained in the Constitution, statutes and opinions of the appellate court. But such a holding would, in my view, leave the law in a chaotic condition, and would be subversive of the best and most salutary interests of the people, and, in the words of our Declaration of Rights, would "tend to anarchy and despotism." It would tend to greatly limit, if not entirely destroy, all dealings based upon contract. No one would feel safe in loaning money upon the solemn obligation of the borrower to repay it in accordance with the terms of the loan; and the enforcement of this doctrine, claimed to be equitable, would return to the people as a plague, demoralizing all industrial and economic transactions based upon obligations to perform, and result in untold hardships and deprivations to the great mass of individuals. It would, in one stroke, convert the government from one of law to one of men, because it would be entirely within the power of the equity court to determine whether or not an emergency did, in fact, exist, and whether or not injustice would be done by enforcement of the settled principles and rules of law. It would result in different rules applicable to one individual from another, under similar circumstances, only dependent upon as little as the whim or caprice of the judge before whom the case was heard.

No one contends for a moment that the application of a settled rule of law or equity does not in some instances work hardship or injustice; yet the best thought and the experience of men, over a period of hundreds of years, demonstrate beyond controversy that definiteness and certainty is one of the greatest factors in seeking to apply the law equally and equitably to all who come under its dominion. There is no case that can be found among the records of this court wherein it has refused or failed to give full effect to a positive,

well-defined, and clearly settled rule of law, even though in the particular instance it were claimed or could be shown that hardship would follow. If the contrary view be now adopted, no lawyer would be in a position to advise his client of his legal rights, and no rule of property or contract would protect the parties from an attack on the ground that the right of one is inequitable or that the enforcement thereof would result in injustice to the other party concerned. The simplest contract between man and man might be unenforceable because in the opinion of the chancellor one of the parties has made a more advantageous bargain than the other.

In the case of *Hedges v. Dixon County,* 150 U. S. 182, 14 S. Ct. 71, 74, 37 L. Ed. 1044, the Supreme Court said: "Where a contract is void at law for want of power to make it, a court of equity has no jurisdiction to enforce such contract, or in the absence of fraud, accident, or mistake to so modify it as to make it legal, and then enforce it. Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law. They are bound by positive provisions of a statute equally with courts of law, and, where the transaction or the contract is declared void because not in compliance with express statutory or constitutional provision, a court of equity cannot interpose to give validity to such transaction or contract, or any part thereof." Again, in *Magniac v. Thomson,* 15 How. (56 U. S.) 281, 299, 14 L. Ed. 696, the court said: "Wherever the rights or the situation of the parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim *equitas sequitur legem* is strictly applicable." In the case of *Harper v. Clayton,* 84 Md. 346, 35 A. 1083, 1084, which was a case where an attempt was made to subject a widow's right of dower in the land of her deceased husband to her debts before same had been assigned and set off to her, and where such claim was denied, it was argued with much force that in equity and good conscience the widow should be compelled to pay her honest debts, and

that a court of equity ought to enforce such claim by subjecting her unassigned dower thereto. On appeal, this court said: "And while it may be said, perhaps, in one sense, that 'in conscience she ought not to deprive her creditors of the benefit of her right of dower' for the payment of their just claims, yet the same may be said of any one who relies on the statute of limitations or exemption laws to defeat such a claim. If debtors could be required by a court of equity to abandon their legal rights, and to subject themselves to the dictates of conscience, or to some law regarded as higher than the law of the land, they would doubtless seldom plead the statute of limitations, or reply upon the provisions of homestead or exemption laws; but whenever these statutes are properly and reasonably pleaded, they are as binding in a court of equity, which is sometimes called a court of conscience, as they are in a court of law. * * * This is only another application of the well-settled principle of equity that 'where a rule, either of statute or common law, is direct, and governs the case in all its circumstances or the particular point, a court of equity is as much bound by it as a court of law, and can as little depart from it.' 1 *Story, Eq. Jur,* sec. 64." Sec. 10 *R. C. L.,* 381, 382, sec. 132; *Phelps, Jurid. Equity,* p. 325, sec. 237; 1 *Pomeroy Eq. Jur.* (4th Ed.), secs. 53, 54; 3 *Blackstone, Comm.* 430; *Baumgartner v. Haas,* 68 Md. 32, 11 A. 588.

The founders of this nation, imbued with the wisdom attained by experience and study of the causes of the rise and fall of republics, ancient and modern, and realizing that the stability and perpetuity of the government then in process of formation must derive all of its just powers from the consent of the governed, set about the great task of formulating the national and various state constitutions, which when completed were submitted for ratification or rejection to the people or their chosen representatives. One of the great objects, if not the paramount purpose, was to declare in plain and unambiguous language a written constitution,

which when adopted should be, has been throughout the life of the republic, and is now, the supreme law of the land, guaranteeing to the people as a whole the right of life, liberty, and the pursuit of happiness, at the same time, by definite limitation, controlling the various branches of the government and bringing within certain bounds the powers of those from time to time intrusted with the administration of public affairs. Such constitutions are the written and controlling evidence of the people's wishes, and are binding alike upon every officer or branch of the government, and the individuals who comprise the nation as a whole. It required no prophetic or superhuman mind to realize that in the years then to come there would arise temporary emergencies creating stress and unrest among the people, but determining in no uncertain terms that, if the nation was to live, it must live and progress under and within the terms of a written constitution. It is in times of emergency, stress, and violence that we need the whole strength of an unbroken constitution to save us from destruction. This thought, the enunciation of this great governmental principle, I find nowhere better expressed than in the case of *Ex parte Milligan*, 4 Wall. (71 U. S.) 2, 120, 18 L. Ed. 295, wherein, speaking of the emergency created by the Civil War, it is said: "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence." In that case the court was considering the legality of the suspension of the writ of habeas corpus and the trial of an accused by the military rather than the civil authorities.

The form taken within the last few months to relieve indi-

viduals from the obligations of their contracts has generally been the passage of legislation. This is especially true in respect to mortgage indebtedness, and is attempted to be made effective by legislation declaring moratoriums or prohibiting the obtention of deficiency judgments where the mortgaged property at foreclosure sale did not produce an amount sufficient to pay the mortgage debt, interest, and costs. As stated, courts of sister jurisdictions have taken different and divergent views on this subject. The Legislature of the State of Arkansas passed such a statute, wherein it was provided that "the plaintiff shall not be entitled to a decree of foreclosure until and unless said plaintiff shall file a stipulation in said cause that he will bid the amounts of the debt, interest and costs." In the case of *Adams v. Spillyards,* 187 Ark. 641, 61 S. W. (2nd) 686, the court of last resort of the State of Arkansas determined that such legislation was unconstitutional as impairing the obligation of existing mortgage contracts. In the case of *Jacobs v. Smallwood,* 63 N. C. 112, Fed. Cas. No. 7,163, in holding unconstitutional a statute prohibiting sale for less than two-thirds of the appraised value, it was said that equity will not enjoin a sale under a mortgage or pledge because a financial depression makes it impossible to sell the property at a fair market price. See, also, *Albers Comm. Co. v. Spencer,* 205 Mo. 105, 103 S. W. 523; *Bolich v. Prudential Ins. Co.,* 202 N. C. 789, 164 S. E. 335. I am not unmindful of decisions holding to the contrary, the most recent leading case being that of *Suring State Bank v. Giese,* 210 Wis. 489, 246 N. W. 556, which has been followed, in part at least, by other courts.

Without attempting critically to analyze decisions to the contrary, I firmly adhere to what might be termed the older, but in my judgment the sounder, view, as set out in what I have heretofore said, especially in view of the language contained in the before quoted article 44 of the Maryland Declaration of Rights. I adhere and give force to that declaration, not only because it is contained in the supreme law of this state, but because I believe it gives voice to a principle which must be sustained if a government such as instituted by the

fathers is to endure. If every emergency is to suspend the provisions and guaranties of the Constitution, who is to say when the emergency exists? It, of necessity, would have to be determined by the Legislature, or by individual judges sitting in equity. If emergency is a valid excuse, the legislative body or courts of equity can at any time determine the fact of an emergency; so that, at the very time when property interests and individual liberties most need protection, we may find that these rights and liberties so sacredly protected and guarded by the Constitution are in fact afforded no protection; it having been nullified by legislative or judicial fiat.

Historically, when we attempt to ascertain the reason for the provisions contained in the Federal Constitution prohibiting the states from passing laws impairing the obligations of contract, we find, just prior to the adoption of that Constitution, the states frequently enacting statutes which have been termed "debtor relief statutes." 20 *Virginia Law Rev. No.* 2, Dec. 1933; 36 *Harvard Law Rev.* 1061-1068. It is not difficult to understand how sufficient pressure, political or otherwise, could be brought upon the state legislatures to enact such legislation; and it was doubtless the desire to put such legislation beyond the power of the states that article 1, section 10, was ingrafted in the Federal Constitution.

Returning to the case before us, I am unable to see any paramount equity in the claim of the appellee. It is to be noted that the contest for this money is between a creditor of the appellee who in good faith loaned it $5,000 in cold cash, receiving in return the appellee's covenant to repay with interest, and stockholders of the appellee corporation who, under the settled law, are entitled to nothing until the just debts of all creditors are paid in full. If constitutional guaranties and obligations of contracts can be lightly set aside when a chancellor believes that an emergency exists, he could, with equal propriety, determine that, equitably, creditors and stockholders of corporations should share in the distribution of its assets equally, without regard to the settled and indisputable law to the contrary. It may be true that,

if the appellant's claim is settled in full, the stockholders will get nothing, but such is now the law, and was the law at the time the appellant loaned her money to the corporation, controlled and managed under the direction of its stockholders, for the purpose of profit. The stockholders have already benefited to the extent of the loan, at the expense of the appellant. If wise and provident administration of the corporation's affairs had resulted in large profits, the stockholders would have been the beneficiaries, and not the appellant. The stockholders' obligation was, and they are charged with the knowledge of that obligation, to pay all the just debts of the corporation before receiving any distribution out of the assets of the corporation. Under the circumstances of this case, we are told much about the hardship flowing to the stockholders in the event they fail to recover in this case. Nothing is said in that regard as to the appellant, but who can know what hardship to the appellant would follow a failure to permit the enforcement of her legal right? This mortgage has been standing a long time, and continued over an unprecedented boom period, from the date of its maturity in 1917 until 1929, during all of which time the appellee, if it had so desired, could have settled the mortgage debt. How can it then be justly heard to complain, upon failure to pay in prosperous times, that it may now be compelled to pay in times of financial and economic stress? This property has been twice sold, after full advertisement, and the sale fairly made in every particular, with no evidence whatever that might lead this court to believe that a larger price could be obtained at a third or any subsequent sale. The mortgage was collateral for the debt; and there is no law which can compel the mortgagee to accept the property in settlement of the debt.

I am compelled to hold that there was error in refusing to ratify this sale, unless it be held under the law that an emergency warrants the suspension or abrogation of legal rights; and this, for the reasons heretofore given, I am unwilling to do.

I am aware of the decision of the Supreme Court of the

United States in the case of *Home Building & Loan Association v. Blaisdell,* 54 S. Ct. 231, 78 L. Ed. —, delivered about January 8th, 1934, wherein it was held that an act of the legislature of the State of Minnesota providing a moratorium in respect to the foreclosure of mortgages did not contravene the provision of the Federal Constitution prohibiting the states from passing any law in violation of the obligations of a contract. I find nothing in that opinion in conflict with what I have heretofore said, in view of the explicit constitutional provision contained in article 44 of the Declaration of Rights of Maryland. In other words, the Supreme Court considered the case of legislative enactment in a state wherein there was no constitutional provision of that state prohibiting such legislation.