SCHEB, Chief Judge.
Appellant, Lee County Bank, challenges an order of the trial court refusing to permit it to foreclose a mortgage in default, and requiring it, as trustee, to accept a reorganization plan for rehabilitation of the debtor’s project. We conclude that the trial court acted beyond its power, and we reverse.
In 1972 Wilson Life Ministries, Inc., purchased a 373-acre parcel of land in Lee County for development of Estero Woods Village, a retirement community project. It financed the purchase and commencement of construction through the issuance and sale of bonds which it secured by a first mortgage on the property. Lee County Bank acted as trustee for the bondholders. Wilson eventually merged into Michigan Baptist Foundation which continued the project. While the bonds, aggregating in excess of $4,000,000, were outstanding, the Foundation issued $3,300,000 in unsecured notes. Meanwhile, it continued to make interest payments on the first mortgage bonds on schedule through 1977.
The Foundation continued its sale of unsecured notes until March 22, 1978, when the Comptroller of the State of Florida filed a complaint alleging that the Foundation was insolvent, and that the first mortgage bonds and unsecured promissory notes had not been registered as required by chapter 517, Florida Statutes (1979). The comptroller further alleged that agents of the Foundation had fraudulently induced many bondholders to relinquish their secured position by exchanging their bonds for unsecured notes. The complaint requested an injunction against the Foundation to prevent further sales of bonds or notes and the appointment of a receiver to conclude the Foundation’s affairs and dispose of its property. With the Foundation’s consent the court issued an injunction and appointed appellee Thomas R. Spencer receiver for the project.
After examining the Foundation’s condition, the receiver informed the court that there were no funds available to pay the interest due in April 1978 on the bonds. On May 26 the receiver further reported that the Bank, as trustee for the bondholders, had threatened to institute foreclosure proceedings because of the default in interest. At the receiver’s request the court temporarily enjoined the Bank from foreclosing, and following a hearing in August, it made the injunction permanent.
*448 The receiver then obtained several proposals to purchase the property for amounts substantially in excess of that necessary to satisfy the first mortgage. After reviewing numerous proposals he announced that he favored one by the Christian Mutual Life Insurance Company to acquire the property. On September 28, 1979, the court entered an order which tentatively approved a revised plan submitted by Christian Mutual Life and ordered the Bank, as trustee for the bondholders, to subordinate its first mortgage to the possessory interest of tenants under residential agreements executed after September 28, 1979. The Bank declined to participate under this plan, and the court relieved it of its obligation to serve as trustee under any substitute indenture. On March 7, 1980, the Bank filed a formal objection to the plan, and on April 16 it made its first foreclosure request. Then on May 8 it asked the court to reject the plan because of its bondholders’ objections, to dissolve the temporary injunction, and for permission to institute foreclosure.
Despite the objection of the Bank and the holders of a substantial amount of outstanding bonds, the court, after a hearing, issued its Final Order Approving Plan and Sale of Capital Assets on June 17. Under the plan as finally approved, appellee Christian Mutual Foundation, a wholly owned subsidiary of Christian Mutual Life, became the owner of the assets of Michigan Baptist Foundation, free of the first mortgage held by the Bank as trustee and of any other claims and liens. The court approved a four-year moratorium on interest due the bondholders and ordered the Bank to execute a satisfaction of its first mortgage and to deliver it to Christian Mutual Foundation. The Foundation was to then issue first priority replacement notes to the bondholders, these to be secured by a mortgage on the project. While the original bonds matured from 1975 to 1981, the replacement notes approved by the court were to mature by March 1, 1985. Some other creditors were elevated to a secured status but one which was inferior to the replacement notes. Finally, the plan provided for the issuance of first priority notes to holders of unsecured certificates who could establish that they had been fraudulently induced to exchange their bonds for the unsecured notes.
The court found that the plan it approved provided for eventual payment of all principal and interest due the bondholders, thereby affording economic benefits to the Bank’s bondholders beyond those which could otherwise be obtained at a foreclosure sale. It also found that the plan continued the lien rights of those bondholders, and adequately protected the rights of Michigan Baptist Foundation’s other creditors. The court did not otherwise state its reason for enjoining the Bank from foreclosing and for accepting the plan of Christian Mutual Foundation. However, we surmise that it determined that the project was a worthy charitable endeavor which should continue as long as there was a plan to protect the bondholders and other creditors.
Appellees advance a forceful equitable argument for upholding the court’s judgment, contending that the value of the plan, as approved, outweighs any value that foreclosure would return to the Bank’s bondholders and the other creditors. We recognize that the receiver and the court have expended considerable creative effort to fashion an equitable settlement of this major problem. In candor, the plan has considerable appeal when viewed from the standpoint of an equitable settlement. Despite this, the threshold question we must address is whether the court had the power to permanently enjoin the Bank as trustee from foreclosing the mortgage on behalf of its bondholders.
Our analysis focuses on two points: (1) whether a court in its general equitable power can impose a moratorium on foreclosure, and (2) whether chapter 517, under which the comptroller acted, or other statutory authority vests such power in the court.
While the supreme court has stated that some degree of impairment of contract by legislative action is tolerable, in practice, the court “has generally prohibited any *449 form of contract impairment.” State v. Chadbourne, Inc., 382 So.2d 293, 297 (Fla.1980). See also Pomponio v. Claridge of Pompano Condominium, Inc., 378 So.2d 774 (Fla.1980); Dewberry v. Auto-Owners Insurance Co., 363 So.2d 1077 (Fla.1978); Yamaha Parts Distributors, Inc., v. Ehrman, 316 So.2d 557 (Fla.1975). On the premise that the constitutional proscription is against the legislature, appellees argue that the judicial branch is not bound to preserve the sanctity of contract provisions. We disagree.
Where there are no allegations of fraud, restraint, oppression, usury, mistake or other facts disclosing an unconscionable advantage, courts of equity have not been permitted to suspend a mortgagee’s right to enforce substantive provisions of a mortgage contract through foreclosure. See Kontz v. Citizens & Southern National Bank, 181 Ga. 70, 181 S.E. 764 (1935); Bolich v. Prudential Insurance Co., 202 N.C. 789, 164 S.E. 335 (1932). In Kenly v. Huntingdon Building Association, 166 Md. 182, 170 A. 526, 529 (1934), Judge Diggs explained the rationale for not permitting a court of equity to enjoin foreclosure of a mortgage:
It would tend to greatly limit, if not entirely destroy, all dealings based upon contract. No one would feel safe in loaning money upon the solemn obligation of the borrower to repay it in accordance with the terms of the loan; and the enforcement of this doctrine, claimed to be equitable, would return to the people as a plague, demoralizing all industrial and economic transactions based upon obligations to perform, and result in untold hardships and deprivations to the great mass of individuals. It would, in one stroke, convert the government from one of law to one of men, because it would be entirely within the power of the equity court to determine whether or not an emergency did, in fact, exist, and whether or not injustice would be done by enforcement of the settled principles and rules of law. It would result in different rules applicable to one individual from another, under similar circumstances, only dependent upon as little as the whim or caprice of the judge before whom the case was heard. No one contends for a moment that the application of a settled rule of law or equity does not in some instances work hardship or injustice; yet the best thought and the experience of men, over a period of hundreds of years, demonstrate beyond controversy that definiteness and certainty is one of the greatest factors in seeking to apply the law equally and equitably to all who come under its dominion.
We think this reasoning is sound, and, of course, it applies as strongly to charitable projects as it does to commercial endeavors.
Florida recognizes these general principles. Our supreme court has held that courts may not withhold entry of a foreclosure judgment merely because of adverse economic conditions and the resultant misfortunes of the mortgagor. Carson v. Farnham, 119 Fla. 1, 160 So. 520 (1935); Morris v. Waite, 119 Fla. 3, 160 So. 516 (1935). In Home Owners’ Loan Corp. v. Wilkes, 130 Fla. 492, 498, 178 So. 161, 163 (1938), the court speaking through the late Justice Terrell said, “The obligation of the mortgagor to pay or the mortgagee to foreclose in accordance with the covenants in the note and mortgage are all absolute and none of them are made contingent on the borrower’s health, good fortune, or ill fortune, or the regularity of his employment.”
Neither State ex rel. Avenius v. Tidball, 35 Wyo. 496, 252 P. 499 (1927), nor State ex rel. Dooley v. Superior Court, 128 Wash. 253, 222 P. 492 (1924), cited by appellees, establishes a rule contrary to that of the above authorities. In both of those cases, a receiver was appointed and the court directed a sale of the property. Even though the sales were to be free of any liens, the proceeds of each sale were to go to a fund and any rights of lienholders to it would be determined later. Additionally, both cases involved writs of prohibition and the precise holding was that the trial courts did not lack jurisdiction.
Finally, appellees’ reliance on First Federal Savings & Loan Association v. Lock *450 wood, 385 So.2d 156 (Fla. 2d DCA 1980), is unavailing. Lockwood dealt with foreclosure by a savings and loan association which accelerated a mortgage to maturity when the mortgagor transferred ownership of the mortgaged property. The association based its right to foreclose solely on a technical violation of a “due-on-sale” clause in the mortgage. It is important to note that Lockwood did not involve a default in scheduled payments, and this court did not perceive any impairment of security under traditional foreclosure principles. Here, on the other hand, there was a default when Michigan Baptist Foundation failed to make the required interest payments to the Bank as trustee for the bondholders. The Bank’s contract was substantially impaired when the court permanently enjoined it from foreclosing and instead required it to accept new priority notes from Christian Mutual Foundation. By effectuating a moratorium on interest and a revision in maturity dates, the court’s judgment substantially impaired the rights of the Bank’s bondholders and created liabilities on the part of Michigan Baptist Foundation which were different from those originally contracted for by the bondholders and Michigan Baptist’s predecessor. Thus, there was a substantial impairment of contract in the constitutional sense. Commodore Plaza at Century 21 Condominium Association v. Cohen, 378 So.2d 307 (Fla. 3d DCA 1979).
Next, we address the question of whether chapter 517 or any other statute confers additional powers on the court which would authorize it to enjoin the Bank from foreclosing on the security for the bondholders’ investments. Section 517.-191(1) authorizes injunctive relief to the comptroller to restrain securities violations while subsection (2) authorizes appointment of a receiver where necessary. It states, in part:
Such receiver or administrator, when appointed and qualified, shall have all powers and duties as to custody, collection, administration, winding up, and liquidation of said property and business as shall from time to time be conferred upon him by the court. In any such action, the court may issue orders and decrees staying all pending suits and enjoining any further suits affecting the receiver’s or administrator’s custody or possession of the said property, assets, and business or, in its discretion, may with the consent of the presiding judge of the circuit require that all such suits be assigned to the circuit court judge appointing the said receiver or administrator.
Here, the court’s order went beyond merely staying pending suits and enjoining other suits which affected the receiver’s custody of assets. Rather, the court permanently enjoined the Bank from foreclosing and permitted the continuation of the project by forcing a reorganization plan on the Bank. Thus, we think the court’s action was beyond the scope of section 517.191. Also, a trial court is empowered to liquidate the assets and business of a corporation and provide an orderly method for adjudicating creditors’ claims. § 607.274, Fla.Stat. (1979). Section 607.284, however, prohibits any action which would affect the enforceability of any recorded mortgage or lien.
Nothing we have said shall be construed to prohibit the court from restoring to a secured status former bondholders who were fraudulently induced to exchange their bonds for unsecured note certificates. Since we are vacating the court’s judgment, it is unnecessary to rule on the issue raised by appellant concerning the adequacy of notice to the bondholders. We reverse and remand the case for further proceedings consistent with this opinion.
HOBSON and DANAHY, JJ., concur.